UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

OLIVER CASEY ESPARZA; PHILLIP NASRALLAH;
WILLIAM THOMAS BLOXHAM; ANKIT GUPTA; JAY
HARPER; RICHARD LEE; and KATHERINE PENDER,
on their own behalf and on behalf of others similarly
situated,

Plaintiffs,

v.

CITY OF NEW YORK; JESSICA S. TISCH;
THOMAS G. DONLON; EDWARD CABAN;
KEECHANT SEWELL;
POLICE OFFICER KENNEY F. VEGA;
POLICE OFFICER JONATHAN A. PESSOA;
POLICE OFFICER THOMAS J. KELLER;
POLICE OFFICER GIOVANNI P. MARTINO;
POLICE OFFICER SHAYE LALL;
and JOHN/JANE DOES 1-100,

Defendants.

---

Case No. 25 Civ. 3815 (DLC)

**FIRST AMENDED
CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

---

Plaintiffs Oliver Casey Esparza, Phillip Nasrallah, William Thomas Bloxham, Ankit Gupta, Jay Harper, Richard Lee, and Katherine Pender, by and through their attorneys, Wang Hecker LLP, for their class action First Amended Complaint allege as follows:

<u>**NATURE OF THE ACTION**</u>

1.      This action arises from the unconstitutional policy and practice of the City of New York (the "City") of detaining, ticketing, and prosecuting cyclists for an action that is expressly permitted by New York City law:  riding a bicycle through an intersection when the traffic signal is red but the pedestrian signal indicates white/walk.

2.      As part of the City's initiative to reduce pedestrian and bicycle injuries and deaths, the City has implemented Leading Pedestrian Intervals ("LPI") at thousands of intersections.  An LPI gives pedestrians the white/walk signal while the traffic signal is still red, allowing pedestrians to enter the crosswalk at an intersection several seconds before vehicles are given a green light, thereby enabling pedestrians to establish their presence in the crosswalk before vehicles are allowed to turn right or left.

3.      The City has also implemented Exclusive Pedestrian Signals, which have an interval that stops traffic in all directions, giving pedestrians and cyclists an exclusive time to cross the street.

4.      In 2019, the New York City Council enacted Local Law 154, which expressly provides that a person operating a bicycle while crossing an intersection shall follow pedestrian control signals (walk/don't walk), not traffic control signals (red/green).

5.      Despite this clear and unambiguous statute, the City maintains a policy and practice of detaining, ticketing, and prosecuting cyclists who lawfully ride through an intersection when the pedestrian control signal indicates white/walk.

6.      Plaintiffs Oliver Casey Esparza and Phillip Nasrallah both commuted to work by bicycle, separately, on October 1, 2024.  Both of them entered the intersection of Third Avenue and East Forty-Second Street in Manhattan during an LPI.  Defendant NYPD Officer Kenney F. Vega unlawfully detained both Mr. Casey Esparza and Mr. Nasrallah and unlawfully issued them summonses – even though Officer Vega expressly acknowledged that the pedestrian signal had indicated white/walk when they entered the intersection, and even though Mr. Casey Esparza expressly told Officer Vega that New York City permitted him to enter the intersection in that circumstance.

7.    Plaintiff William Thomas Bloxham went for a ride on his bicycle to get exercise on November 20, 2024.  He was riding south on Tompkins Avenue in Brooklyn, approaching the intersection of Dekalb Avenue, when he proceeded through the light during an LPI and was unlawfully detained and issued a summons by Defendant Police Officer Jonathan A. Pessoa.  Mr. Bloxham informed Defendant Pessoa that he had crossed with the pedestrian light.  Defendant Pessoa responded, in substance, that it did not matter "because a bicycle was like a car" for purposes of crossing the street.

8.    Plaintiff Ankit Gupta commuted home by bicycle on May 20, 2025.  He entered the intersection of Grand Avenue and East 69th Street in Woodside, Queens during an LPI.  Defendant Police Office Thomas J. Keller unlawfully detained Mr. Gupta and unlawfully issued him a summons.  Mr. Gupta explained that he had crossed with the pedestrian light and that doing so had been lawful under New York City law since 2019, but Defendant Keller responded, in substance, "We know the law."

9.    Plaintiff Jay Harper commuted by bicycle to a medical appointment on April 5, 2024.  He entered the intersection of Manhattan Avenue and West 122nd Street in Manhattan during an LPI.  Defendant Police Officer Giovanni P. Martino unlawfully detained Mr. Harper and unlawfully issued him a summons.  Mr. Harper stated to Defendant Martino that he had crossed with the pedestrian light and told him that it is legal to do so, but Defendant Martino insisted, "No it's not."

10.    Plaintiff Richard Lee commuted by bicycle on September 4, 2024.  He entered the intersection of Thomas S. Boyland Street and Pitkin Avenue in Brooklyn during an LPI.  Defendant NYPD Officer John Doe 1 detained him and unlawfully issued him a summons.  Mr.

Lee asked Defendant NYPD Officer John Doe 1 if he was aware of the LPI law, and he responded that he was not.

11.     Plaintiff Katherine Pender was traveling home by Citi Bike ebike on June 4, 2025. She entered the intersection of Lexington Avenue and East 50th Street in Manhattan during an LPI.  Defendant NYPD Officer Shaye Lall and three other Defendant NYPD Officers unlawfully detained her and issued her a summons.  Ms. Pender informed the officers that she began cycling through the intersection only after the pedestrian light changed to white.

12.     The City and its police officers have engaged and continue to engage in the same unlawful behavior, over and over, detaining, ticketing, and prosecuting hundreds or thousands of law-abiding New Yorkers for riding bicycles through intersections at the safest time to do so.

13.     This action seeks redress for Plaintiffs and a class of similarly situated individuals, and to advance the significant public interest, embodied in New York City's Vision Zero initiative, in avoiding injury and death on public roadways.  Defendants should be enjoined from engaging in this blatantly unlawful practice once and for all and should pay damages to compensate Plaintiffs and the class for their false arrests and wrongful prosecutions.

## JURISDICTION AND VENUE

14.     This action arises under 42 U.S.C. §§ 1983 and 1988 and the Fourth and Fourteenth Amendments to the United States Constitution.

15.     The jurisdiction of this Court is predicated on 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

16.     This Court has supplemental jurisdiction over Plaintiffs' claims under state and local law pursuant to 28 U.S.C. § 1367 because those claims closely relate to the federal claims,

having arisen from a common nucleus of operative facts, such that the state and local law claims form part of the same case or controversy.

17.    Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the acts complained of occurred in the Southern District of New York.

### JURY DEMAND

18.    Plaintiffs demand a trial by jury in this action.

### PARTIES

19.    Plaintiff Oliver Casey Esparza is a natural person who resides in New York County, New York.

20.    Plaintiff William Thomas Bloxham is a natural person who resides in Kings County, New York.

21.    Plaintiff Ankit Gupta is a natural person who resides in Queens County, New York.

22.    Plaintiff Jay Harper is a natural person who resides in New York County, New York.

23.    Plaintiff Richard Lee is a natural person who resides in Kings County, New York.

24.    Plaintiff Philip Nasrallah is a natural person who resides in New York County, New York.

25.    Plaintiff Katherine Pender is a natural person who resides in New York County, New York.

26.    Defendant City of New York (the "City") is a municipality organized and existing under the laws of the State of New York.  At all relevant times, the City, acting through the New York City Police Department (the "NYPD"), was responsible for formulating, implementing, and

supervising all police policies and practices and was responsible for the appointment, training, and supervision of all police personnel. At all relevant times, the City was responsible for ensuring that NYPD personnel obey the laws of the City, the State of New York, and the United States Constitution.

27.     Defendant Jessica S. Tisch is the Commissioner of the NYPD. As such, she is the person chiefly and ultimately responsible for formulating, implementing, and supervising NYPD policies and practices. At all relevant times, she was acting within the scope of her employment under color of law. She is sued in her individual and official capacities.

28.     Defendant Thomas G. Donlon served as the acting Commissioner of the NYPD from September 2024 to November 2024. During that period, he was the person chiefly and ultimately responsible for formulating, implementing, and supervising NYPD policies and practices. At all relevant times, he was acting within the scope of his employment under color of law. He is sued in his individual capacity.

29.     Defendant Edward A. Caban served as the Commissioner of the NYPD from July 2023 to September 2024. During that period, he was the person chiefly and ultimately responsible for formulating, implementing, and supervising NYPD policies and practices. At all relevant times, he was acting within the scope of his employment under color of law. He is sued in his individual capacity.

30.     Defendant Keechant Sewell served as the Commissioner of the NYPD from January 2022 to June 2023. During that period, she was the person chiefly and ultimately responsible for formulating, implementing, and supervising NYPD policies and practices. At all relevant times, she was acting within the scope of her employment under color of law. She is sued in her individual capacity.

31.     Defendant Police Officer Kenney F. Vega is an NYPD Officer.  At all times relevant hereto, Defendant Vega was a police officer employed by the NYPD, acting in the capacity of an agent, servant, and employee of defendant City, and within the scope of his employment as such, and acting under color of law.  Defendant Vega is sued in his individual capacity.

32.     Defendant Police Officer Jonathan A. Pessoa is an NYPD Officer.  At all times relevant hereto, Defendant Pessoa was a police officer employed by the NYPD, acting in the capacity of an agent, servant, and employee of defendant City, and within the scope of his employment as such, and acting under color of law.  Defendant Pessoa is sued in his individual capacity.

33.     Defendant Police Officer Thomas J. Keller is an NYPD Officer.  At all times relevant hereto, Defendant Keller was a police officer employed by the NYPD, acting in the capacity of an agent, servant, and employee of defendant City, and within the scope of his employment as such, and acting under color of law.  Defendant Keller is sued in his individual capacity.

34.     Defendant Police Officer Giovanni P. Martino is an NYPD Officer.  At all times relevant hereto, Defendant Martino was a police officer employed by the NYPD, acting in the capacity of an agent, servant, and employee of defendant City, and within the scope of his employment as such, and acting under color of law.  Defendant Martino is sued in his individual capacity.

35.     Defendant Police Officer Shaye Lall is an NYPD Officer.  At all times relevant hereto, Defendant Lall was a police officer employed by the NYPD, acting in the capacity of an

agent, servant, and employee of defendant City, and within the scope of her employment as such, and acting under color of law. Defendant Lall is sued in her individual capacity.

36.    Defendant John/Jane Does 1-100 are NYPD officers or supervisors. At all times relevant hereto, Defendant John/Jane Does 1-100 were police officers or supervisors employed by the NYPD, acting in the capacity of an agent, servant and employee of defendant City, and within the scope of their employment as such, and acting under color of law. Defendant John/Jane Does 1-100 are sued in their individual capacities.

## FACTUAL ALLEGATIONS

### The "Go With the Walk" Law

37.    According to the New York City Department of Transportation ("DOT"), the number of people commuting by bicycle in the City has risen dramatically over the past two decades, increasing from approximately 15,000 daily commuters in 2000 to approximately 61,000 daily commuters in 2023.

38.    The City launched its "Vision Zero" initiative in 2014 with the aim of eliminating traffic fatalities and injuries. But despite some meaningful improvements as a result of those efforts – particularly for pedestrian safety – cycling in New York City remains highly dangerous. For example, 2023 saw the highest number of cyclist fatalities since 1999.

39.    As part of the Vision Zero initiative, the City has since 2014 prioritized installing "Leading Pedestrian Intervals" at thousands of intersections. A "Leading Pedestrian Interval" or LPI is a system in which the pedestrian signal turns to white/walk several seconds before the traffic signal turns green, which gives pedestrians and cyclists a head start when crossing the intersection. This allows them to be visible to drivers, as they are already crossing by the time the drivers are permitted to move.

40.    In 2016, the DOT published a study regarding pedestrian and bicyclist injuries as a result of crashes with motor vehicles turning left.  The study found that LPIs significantly reduced the number of pedestrians and cyclists injured or killed by left-turning vehicles.[1]

41.    In 2019, the DOT published the results of a pilot program in which cyclists were permitted to cross on the LPI at 50 intersections around the City.  DOT found that "the vast majority of people biking currently proceed on the LPI and no conflicts or near misses were observed."  DOT therefore recommended that cyclists be allowed to follow pedestrian signals citywide, provided that users yield to pedestrians and that DOT could exempt certain intersections through signage.[2]

42.    Heeding this DOT recommendation, in 2019, the New York City Council enacted Local Law 154, which amended the New York City Administrative Code to make clear that cyclists are permitted to cross intersections when the pedestrian signal shows a white/walk signal:

> A person operating a bicycle while crossing an intersection shall follow pedestrian control signals except where otherwise indicated by traffic control devices, and provided that such person shall yield to pedestrians in the crosswalk.

N.Y.C. Admin. Code 19-195.1(b).  This law went into effect on December 21, 2019.

43.    The City has engaged in widespread public awareness efforts to inform cyclists of this law so that they will take advantage of it and thus be safer.

44.    The City's Vision Zero website states:

> Since 2019, cyclists have been allowed to use leading pedestrian intervals (LPIs), meaning they can go through a red light when the parallel

---

[1]    *See* https://www.nyc.gov/html/dot/downloads/pdf/left-turn-pedestrian-and-bicycle-crash-study.pdf.

[2]    *See* https://www.nyc.gov/html/dot/downloads/pdf/bike-lpi-study-memo.pdf.

pedestrian signal changes to "walk." This is a safe way to reduce stressful interactions at intersections.[3]

45.     Similarly, both the DOT's official NYC Bike Map and a DOT publication called "Bike Laws" instruct cyclists to "Go with the walk," stating that "Unless there is a bike signal or sign, cross the intersection when the pedestrian signal shows the 'walk'":



.[4]

46.     The law has been clearly established at least since 2019 that cyclists in New York City are permitted to cross intersections during red light traffic signals while the pedestrian light indicates white/walk, including during LPIs.

The City's Unlawful Policy and Practice

47.     The City, through the NYPD, maintains a policy and practice of detaining, ticketing, and prosecuting cyclists who lawfully ride through intersections during red light traffic signals while the pedestrian light indicates white/walk.

48.     This policy and practice is so consistent and widespread that it constitutes a custom or usage of which supervising policymakers must have been aware.

---

[3] *See* https://www.nyc.gov/content/visionzero/pages/bicycles.
[4] *See* https://www.nyc.gov/html/dot/downloads/pdf/nyc-bike-map-2024.pdf and https://www.nyc.gov/html/dot/downloads/pdf/bike-laws.pdf.

49.     This policy and practice results directly from the failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

Plaintiffs Oliver Casey Esparza and Phillip Nasrallah

50.     Plaintiff Oliver Casey Esparza lives and works in Manhattan.  He frequently commutes to work by bicycle.

51.     Plaintiff Phillip Nasrallah lives and works in Manhattan.  He has frequently commuted to work by bike.

52.     On October 1, 2024, Mr. Casey Esparza biked to work, as did Mr. Nasrallah, separately.  At approximately 8:37 AM, both Mr. Casey Esparza and Mr. Nasrallah arrived at the intersection of East 42nd Street and 3rd Avenue in Manhattan and stopped.  After the LPI light turned to a white signal, indicating that it was permissible to cross, both Mr. Casey Esparza and Mr. Nasrallah crossed the intersection going westbound on 42nd Street.  No pedestrians or vehicles were in or near their path, and both the pedestrian and vehicle signals on the perpendicular street (3rd Avenue) were red at the time they crossed the intersection.

53.     Plaintiffs Casey Esparza and Nasrallah were both stopped by Defendant Police Officer Vega, who indicated that he was stopping both of them for going through the red traffic light.  Mr. Casey Esparza told Defendant Vega that the pedestrian signal had been white, and explained that under applicable law bicycles are permitted to cross intersections when the pedestrian signal is white.  Defendant Vega expressly acknowledged that the pedestrian signal had been white when Mr. Casey Esparza had crossed the intersection but said that he was "99% sure" that Mr. Casey Esparza was wrong about the law.

54.     Plaintiffs Casey Esparza and Nasrallah both understood that their freedom of movement was constrained and that they were not free to leave or to continue biking to work when they were stopped by Defendant Vega.

55.     After Defendant Vega unlawfully stopped Plaintiffs Casey Esparza and Nasrallah, Defendant Vega demanded that Plaintiffs Casey Esparza and Nasrallah produce identification and then wait.

56.     Plaintiffs Casey Esparza and Nasrallah both understood that they were not free to leave until Defendant Vega finished writing out the tickets/summonses and returned their identification documents to them.

57.     Defendant Vega issued Plaintiff Casey Esparza a Traffic Violation that stated that "BICYCLE FAILED TO YIELD TO VEH/PEDESTRIAN AT RED LIGHT-NYC" and indicated that Casey had violated Section "4-03(A)(3)(II)" of the NYCTRR.  (That subsection concerns intersections where signs expressly indicate that right or left turns on red signals are permissible, so it did not even apply to the alleged violation.)

58.     Defendant Vega issued Plaintiff Nasrallah a Traffic Violation that stated that "BICYCLE FAILED TO YIELD TO VEH/PEDESTRIAN AT RED LIGHT-NYC" and indicated that Nasrallah had violated the same plainly inapplicable subsection, Section "4-03(A)(3)(II)" of the NYCTRR.

59.     Plaintiff Casey Esparza had a court date for the violation on April 15, 2025.  The judge dismissed the violation at that hearing.

60.     Plaintiff Nasrallah was given a court date for the violation, but it was adjourned and remains pending.

Plaintiff William Thomas Bloxham

61.     Plaintiff William Thomas Bloxham went for a ride on his bicycle to get exercise on November 20, 2024.

62.      At approximately 8:56 AM, he was riding south on Tompkins Avenue in Brooklyn during his return trip home.

63.     When he reached the intersection of Tompkins Avenue and Dekalb Avenue, Mr. Bloxham stopped at the red light and waited for the signal to change.  He then proceeded through the light during an LPI.  No pedestrians were present in the intersection when Mr. Bloxham crossed the street.

64.     A police cruiser with flashing lights and siren pulled over Mr. Bloxham after he crossed the intersection.  Defendant Police Officer Jonathan Pessoa demanded to see Mr. Bloxham's identification.  Mr. Bloxham did not have identification because he had not brought his driver's license with him to exercise on his bicycle.  Defendant Pessoa ultimately allowed Mr. Bloxham to identify himself through information on his phone.

65.     Mr. Bloxham informed Defendant Pessoa that he had lawfully crossed the intersection with the pedestrian light.  Defendant Pessoa responded, in substance, that it did not matter "because a bicycle was like a car" for purposes of traffic signal rules.

66.     Mr. Bloxham understood during his interaction with Defendant Pessoa, which lasted for approximately 10 to 15 minutes, that he was not free to leave until he was given permission to do so.  The situation was extremely stressful for Mr. Bloxham who needed to return home promptly to catch a train for the Thanksgiving holiday.

67.    Defendant Pessoa issued Mr. Bloxham a traffic ticket for allegedly crossing an intersection on a red light, in violation of Section 1110(a) and (b) of the Vehicle and Traffic Law.  Mr. Bloxham has pled not guilty and is presently awaiting his hearing.

Plaintiff Ankit Gupta

68.    On May 20, 2025, Plaintiff Ankit Gupta was biking home from Manhattan to his residence in Jackson Heights, Queens at approximately 10:14 PM.

69.    Mr. Gupta crossed the intersection of Grand Avenue and East 69th Street in Woodside, Queens during an LPI.

70.    Two NYPD officers, including Defendant Police Officer Thomas J. Keller, then pulled him over in a police car.  Defendant Keller demanded Mr. Gupta's identification and ordered him to wait.

71.    Defendant Keller asked Mr. Gupta if he had crossed the intersection during a red light, and Mr. Gupta said that he had crossed with the pedestrian light.  Defendant Keller said, in substance, "You're not a pedestrian."  Mr. Gupta said that there has been a law since 2019 that permits bikes to cross during the pedestrian light.  Defendant Keller said, in substance, "We know the law," and that "we're letting you off with a non-moving violation."

72.    Defendant Keller issued Mr. Gupta a traffic ticket alleging a failure to stop at a red light in violation of Section 1111(d)(1) of the Vehicle and Traffic Law.

73.    Mr. Gupta was detained for approximately 15 minutes before Defendant Keller permitted him to leave.  Mr. Gupta understood that he was not free to leave until Defendant Keller finished writing out the summons and returned his identification to him.

74.    Mr. Gupta's court date for the ticket is scheduled to occur on June 2, 2026, more than a year after the incident.

Plaintiff Jay Harper

75.    At approximately 9:00 AM on April 5, 2024, Plaintiff Jay Harper rode his bicycle in Harlem, where he lives, to a medical appointment.

76.    When Mr. Harper arrived at the intersection of Manhattan Avenue and West 122nd Street, the pedestrian light was white, so Mr. Harper carefully proceeded through the intersection.

77.    Defendant Police Officer Giovanni P. Martino, driving southbound and stopped at a light, pulled Mr. Harper over in a police car.

78.    Defendant Martino ordered Mr. Harper to produce identification and wait.

79.    Mr. Harper stated to Defendant Martino that he had crossed with the pedestrian light and told him that it is legal to do so, but Defendant Martino insisted, "No it's not."  A second police officer joined Defendant Martino, and the two officers proceeded to ask Mr. Harper repeatedly what color the traffic light had been when he crossed the intersection.  Mr. Harper responded each time that the pedestrian white had indicated walk.

80.    During the stop, Mr. Harper pulled up a news article on his phone about the 2019 LPI law, but Defendant Martino refused even to look at it.

81.    Defendant Martino issued Mr. Harper a traffic ticket for allegedly crossing an intersection on a red light, in violation of Section 1110(a) and (b) of the Vehicle and Traffic Law.

82.    Mr. Harper was detained for approximately 15 minutes before Defendant Martino permitted him to leave.  Mr. Harper understood that he was not free to leave until Defendant Martino finished writing out the summons and returned his identification to him.

83.    Mr. Harper's court date for the ticket is scheduled for March 31, 2026.

84.    Less than three weeks before that incident, a cyclist had been killed at the intersection of Manhattan Avenue and West 122nd Street when he was struck by a postal truck. Upon information and belief, NYPD officers were monitoring that intersection as a result of that incident.

85.    Rather than taking steps to ensure that the site of the fatal incident was safer for cyclists, Defendant Martino did precisely the opposite, detaining and ticketing Mr. Harper for following the safest practice of crossing during the LPI.

Plaintiff Richard Lee

86.    Plaintiff Richard Lee commuted to work by bicycle on September 4, 2024.

87.    During his commute, Mr. Lee entered the intersection of Thomas S. Boyland Street and Pitkin Avenue in Brooklyn during an LPI.

88.    Defendant NYPD Officer John Doe 1 pulled Mr. Lee over in a police car and ordered him to produce identification.

89.    Mr. Lee asked Defendant John Doe 1 whether he was aware of the New York City law that permits cyclists to cross during LPIs. The officer responded that he was not aware of it but would look it up later.

90.    Defendant John Doe 1 then issued Mr. Lee a summons for allegedly running a red light.

91.    Mr. Lee was detained for approximately 10 to 15 minutes before Defendant John Doe 1 permitted him to leave. Mr. Lee understood that he was not free to leave until Defendant John Doe 1 finished writing out the summons and returned his identification to him.

92.    A virtual hearing was held on Mr. Lee's summons on December 26, 2024. The violation was dismissed.

Plaintiff Katherine Pender

93.    Plaintiff Katherine Pender was traveling home by Citi Bike ebike on June 4, 2025.

94.    She entered the intersection of Lexington Avenue and East 50th Street in Manhattan during an LPI.

95.    Defendant Shaye Lall ran out in front of her bike in the middle of the intersection.

96.    Three other Defendant NYPD Officers joined Defendant Lall and surrounded Ms. Pender.

97.    A larger group of Defendant NYPD Officers observed the encounter.

98.    Ms. Pender informed the officers that she began cycling through the intersection only after the pedestrian light changed to white.  Nevertheless, the Defendant NYPD Officers lectured her about how she could have killed someone.

99.    Defendant Lall then issued Ms. Pender a summons for allegedly running a red light.

100.    Ms. Pender was detained for approximately 10 minutes.  Ms. Pender understood that she was not free to leave until Defendant Lall finished writing out the summons and returned Ms. Pender's identification.

Plaintiffs Are Likely to Be Subjected to Additional Unlawful Conduct by Defendants

101.    All of the named Plaintiffs continue to bicycle routinely and regularly throughout New York City.  In order to reduce their risk of being injured or killed by a motor vehicle, each of the Plaintiffs continues lawfully to cycle across intersections with LPI signals that permit their cycling across the intersection during the LPI but when the traffic light is red.

102.    City data shows that among the areas in which NYPD officers ticket cyclists at a particularly high rate are "north-south corridors in Manhattan," in which several of the Plaintiffs frequently travel by bicycle.[5]

103.    Given the Plaintiffs' frequent cycling in New York City, Defendants' ongoing policy and practice of issuing tickets and/or criminal summonses for cycling across an intersection when the traffic light is red and the pedestrian light indicates white/walk, and Defendants' recent policy of increasing its crackdown on cyclists, including in particular in the areas of Manhattan in which several Plaintiffs frequently travel, Plaintiffs are likely to be unlawfully ticketed again in the immediate future.

## CLASS ALLEGATIONS

104.    With respect to the injunctive claims, Plaintiffs brings this action on their own behalf and, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), and (b)(2), on behalf of:

> All individuals who have been or will be detained, arrested, ticketed, and/or prosecuted for cycling through an intersection in New York City while the pedestrian light indicated white/walk.

105.    Defendants have acted, or failed to act, on grounds generally applicable to the Rule (b)(2) Class, thereby making appropriate final injunctive relief with respect to the Rule (b)(2) Class as a whole.

106.    With respect to their damages claims, Plaintiffs bring this action on their own behalf and, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), and (b)(3), on behalf of:

> All individuals who were detained, arrested, ticketed, and/or prosecuted for cycling through an intersection in New York City while the pedestrian light indicated white/walk during the fullest period permitted by the applicable statute of limitations.

---

[5] https://nyc.streetsblog.org/2025/05/06/as-nypds-criminal-crackdown-on-cyclists-expands-it-grows-more-absurd-victims.

107.    The Rule (b)(2) and Rule (b)(3) classes are each so numerous that joinder of all members is impracticable.  Upon information and belief, during the past three years, hundreds of cyclists have been ticketed by the NYPD for crossing intersections while the pedestrian light indicated white/walk, and currently and in the future, many dozens, if not hundreds of cyclists are being subjected to and will be subjected to being stopped, ticketed/summoned and subjected to unlawful prosecution.

108.    Numerous incidents of such unlawful ticketing have been documented in recent years.

109.    In June 2021, NYPD Officer Jessica Ricotta ticketed a cyclist at 30th Avenue and 21st Street in Astoria for crossing an intersection during an LPI.[6]

110.    In November 2021, Officer Ricotta ticketed another cyclist at the same intersection for crossing during an LPI.[7]

111.    In June 2022, NYPD Officer James Mariconi ticketed cyclist Andrea Adleman for crossing the intersection of 41st Street and Sixth Avenue in Manhattan during an LPI.[8]

112.    In September 2022, cyclist Darren Goldner was ticketed for crossing an intersection on 4th Avenue in Sunset Park, Brooklyn during an LPI.[9]

113.    Numerous other cyclists have reported on online forums having been ticketed by NYPD officers for crossing during LPIs:

---

[6] *See* https://nyc.streetsblog.org/2021/11/15/courtesy-professional-and-disrespect-nypd-tickets-e-bike-riders-for-legally-following-pedestrian-signal.
[7] *Id.*
[8] *See* https://nyc.streetsblog.org/2023/12/13/cyclist-takes-nypd-to-court-over-improper-red-light-tickets.
[9] *See* https://nyc.streetsblog.org/2022/09/06/the-nypd-and-dmv-are-punishing-cyclists-for-legally-crossing-with-the-pedestrian-signal.

- A cyclist reported being ticketed in May 2023 for crossing the intersection of South 5th and Berry in Brooklyn during an LPI;[10]

- A cyclist reported being ticketed in June 2023 for crossing an intersection in the Lower East Side in Manhattan during an LPI;[11]

- A cyclist reported being ticketed in October 2023 for crossing the intersection of 12th Street and 1st Avenue in Manhattan during an LPI;[12]

- A cyclist reported being ticketed in June 2024 for crossing the intersection of 44th Street and 4th Avenue in Brooklyn during an LPI;[13]

- A cyclist reported being ticketed in October 2024 for crossing an intersection in Sunset Park, Brooklyn during an LPI;[14]

- A cyclist reported being given three separate tickets in February 2025 for crossing an intersection in Brooklyn during an LPI;[15] and

- A cyclist reported that in April 2025 they were issued a criminal court summons for crossing the intersection of 24th Street and 6th Avenue in Manhattan during an LPI.[16]

114.    Upon information and belief, during the past three years, there have been hundreds or thousands more such incidents of cyclists being unlawfully ticketed or issued summonses for crossing intersections while the pedestrian light indicated white/walk.

---

[10] *See* https://www.reddit.com/r/NYCbike/comments/13ky8cz/just_got_a_red_light_ticket_for_going_on_leading/

[11] *See* https://www.reddit.com/r/NYCbike/comments/14n4yhq/red_light_ticket_190/

[12] *See* https://www.reddit.com/r/NYCbike/comments/17fclfx/ticketed_for_going_on_lpi/

[13] *See* https://www.reddit.com/r/NYCbike/comments/14n4yhq/red_light_ticket_190/

[14] *See* https://www.reddit.com/r/NYCbike/comments/1ge9fbl/careful_with_red_light_bike_ticketing_in_sunset/

[15] *See* https://www.reddit.com/r/NYCbike/comments/1in47ww/stopped_for_going_through_red_light_got_three/

[16] *See* https://www.reddit.com/r/NYCbike/comments/1ka4r4y/finally_got_a_red_light_ticket_advice/

115.    Upon information and belief, many of those tickets and summonses have been dismissed or otherwise adjudicated in favor of the cyclists.

116.    The NYPD has recently quietly implemented a policy to focus on a crackdown on cyclists which is likely to result in an increase in ticketing and criminal summonses to cyclists in New York City[17], and accordingly an increase in the unlawful tickets and summonses being handed out in contravention of N.Y.C. Admin. Code 19-195.1(b).

117.    The number of tickets given to cyclists increased dramatically in the first quarter of 2025 compared to any of the last four years.[18]

118.    Despite the NYPD's occasional claim that increasing the ticketing of cyclists furthers pedestrian safety, the data show otherwise.  A tiny percentage of pedestrian injuries are caused by bicycles of any sort.

119.    The putative Rule (b)(2) and Rule (b)(3) classes are sufficiently large that joinder of all the members would be impractical.

120.    Pursuant to the City's policy and practice, all of the Rule (b)(3) class members were subjected to violations of their constitutional rights which caused injury, including without limitation psychological injury and/or lost wages, time, and attorney's fees spent fighting the unlawful tickets/summonses.

121.    On information and belief, many of the putative class members are economically disadvantaged, making individual lawsuits impracticable.

---

[17] *See* https://nyc.streetsblog.org/2025/05/02/policy-change-nypd-will-write-criminal-summonses-not-traffic-tickets-for-cyclists.
[18] https://nyc.streetsblog.org/2025/05/06/as-nypds-criminal-crackdown-on-cyclists-expands-it-grows-more-absurd-victims.

122.    Judicial economy weighs in favor of avoiding multiple actions challenging the same policy and practice, particularly where individual suits could lead to potentially inconsistent results.

123.    The class members are identifiable using records maintained by the City in the ordinary course of business.

124.    According to NYPD data, over 13,000 cyclists were ticketed for traffic signal violations between 2018 and 2024.

125.    The City maintains data on the precise location of each ticket issued to a cyclist, including the geographic coordinates.

126.    There are at least 6,659 intersections in New York City with LPIs, and an additional at least 707 intersections in New York City with Exclusive Pedestrian Signals, according to data made publicly available by the City.

127.    The City maintains lists of all intersections with LPIs and Exclusive Pedestrian Signals, including their geographic coordinates.

128.    Common questions of law and fact exist for all class members herein and predominate over any questions solely affecting individual members thereof.

129.    Among the questions of law and fact common to members of the class are: (i) whether and which defendants failed to understand N.Y.C. Admin. Code 19-195.1(b), including by wrongfully arresting, detaining, charging, summonsing, ticketing and/or prosecuting class members for a violation of law when there was none; (ii) the existence of a pattern and practice of stopping, arresting, and ticketing and/or issuing criminal summonses to members of the class; (iii) the acquiescence of supervisory personnel in the NYPD in the known unlawful acts of subordinates; (iv) the failure of supervisory defendants to train, supervise, and

discipline police officers; and (v) the appropriate injunctive remedies that will be needed to ensure the end of this unlawful pattern and practice, and to ensure that its harmful effects are remedied.

130.    The City is expected to raise common defenses to the claims of all class members herein, including denying that its policy and practice violated the Constitution.

131.    Common issues of law and fact such as those set forth above, and many others, predominate over any individual issues.

132.    Plaintiffs' claims are typical of those of all putative class members herein, as Plaintiffs' claims arise from the same municipal policy and practice, and Plaintiffs' claims are based on the same legal theories as those of all putative class members herein.

133.    The cause of Plaintiffs' injuries is the same as the cause of the injuries suffered by all putative class members herein, namely the City's policy and practice.

134.    Maintaining this action as a class action is superior to other available methods because individual damages claims are not likely to be feasible.

135.    All of the members of the Rule (b)(3) class were injured as a result of Defendants' conduct, including without limitation the psychological injury of being subjected to unlawful tickets and summonses as well as lost time, wages, and/or attorney's fees spent in fighting the unlawful ticket/summons.  The damages suffered by members of the Class are small in relation to the extraordinary expense and burden of individual litigation and therefore it is highly impractical for such Class members to attempt redress for damages incurred due to their wrongful arrest and prosecution.

136.    Plaintiffs are capable of fairly and adequately protecting the interests of all putative class members herein because Plaintiffs do not have any antagonistic interests thereto.

137.    Counsel for Plaintiffs is experienced in civil rights litigation, complex litigation, and class actions.

### FIRST CLAIM FOR RELIEF
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments – False Arrest
(Against All Defendants)

138.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

139.    Defendant Vega wrongfully and intentionally arrested Plaintiff Casey Esparza when he detained Plaintiff against his will for the purpose of subjecting Plaintiff Casey Esparza to an unlawful ticket/summons.

140.    Defendant Vega wrongfully and intentionally arrested Plaintiff Nasrallah when he detained Plaintiff Nasrallah against his will for the purpose of subjecting him to an unlawful ticket/summons.

141.    Defendant Pessoa wrongfully and intentionally arrested Plaintiff Bloxham when he detained Plaintiff Bloxham against his will for the purpose of subjecting him to an unlawful ticket/summons.

142.    Defendant Keller wrongfully and intentionally arrested Plaintiff Gupta when he detained Plaintiff Gupta against his will for the purpose of subjecting him to an unlawful ticket/summons.

143.    Defendant Martino wrongfully and intentionally arrested Plaintiff Harper when he detained Plaintiff Harper against his will for the purpose of subjecting him to an unlawful ticket/summons

144.    Defendant John Doe 1 wrongfully and intentionally arrested Plaintiff Lee when he detained Plaintiff Lee against his will for the purpose of subjecting him to an unlawful ticket/summons.

145.    Defendant Lall wrongfully and intentionally arrested Plaintiff Pender when he detained Plaintiff Pender against her will for the purpose of subjecting her to an unlawful ticket/summons.

146.    Plaintiffs were conscious of the unlawful confinement.

147.    Plaintiffs did not consent to the confinement.

148.    The confinement of Plaintiffs was not privileged because Defendants Vega, Pessoa, Keller, Martino, John Doe 1, and Lall lacked reasonable suspicion and/or probable cause to stop and detain Plaintiffs.

149.    The actions of Defendants Vega, Pessoa, Keller, Martino, John Doe 1, and Lall deprived Plaintiffs of the rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. §1983, including, without limitation, rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

150.    Defendants Jane and John Does 2 through 100 have and/or will deprive the putative Rule (b)(2) and Rule (b)(3) class members of the rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including, without limitation, rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution, by, *inter alia*: stopping and falsely arresting the putative class members by detaining them for the purpose of issuing baseless and unlawful tickets/summonses.

151.    The City, through the NYPD, maintains a policy and practice of detaining and/or arresting cyclists who lawfully ride through intersections during red light traffic signals while the pedestrian light indicates white/walk.

152.    This policy and practice is so consistent and widespread that it constitutes a custom or usage of which policymakers, including the individual Commissioner Defendants, must have been aware.

153.    This policy and practice results directly from the failure by policymakers, including the individual Commissioner Defendants, to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

154.    As a direct and proximate result of the City's policy and practice, Plaintiffs and the putative Rule (b)(3) class members suffered damages in an amount to be proven at trial.

155.    As a direct and proximate result of the City's ongoing policy and practice, Plaintiffs and the putative Rule (b)(2) class members have and will suffer unlawful stops, arrests and prosecution, pursued and imposed upon them without any legal basis, which must be enjoined.

156.    Because Defendants' unlawful conduct was and is knowing, purposeful, malicious, and outrageous, Plaintiffs and the putative Rule (b)(3) class members are entitled to an award of punitive damages.

**SECOND CLAIM FOR RELIEF**
New York State Constitution, Article I, § 12
(Against All Defendants)

157.    Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth herein.

158.     Defendant Vega wrongfully and illegally stopped, detained, and arrested Plaintiffs Casey Esparza and Nasrallah without legal basis or justification in violation of their rights under Article I, § 12 of the New York Constitution.

159.     Defendant Pessoa wrongfully and illegally stopped, detained, and arrested Plaintiff Bloxham without legal basis or justification in violation of his rights under Article I, § 12 of the New York Constitution.

160.     Defendant Keller wrongfully and illegally stopped, detained, and arrested Plaintiff Gupta without legal basis or justification in violation of his rights under Article I, § 12 of the New York Constitution.

161.     Defendant Martino wrongfully and illegally stopped, detained, and arrested Plaintiff Harper without legal basis or justification in violation of his rights under Article I, § 12 of the New York Constitution.

162.     Defendant John Doe 1 wrongfully and illegally stopped, detained, and arrested Plaintiff Lee without legal basis or justification in violation of his rights under Article I, § 12 of the New York Constitution.

163.     Defendant Lall wrongfully and illegally stopped, detained, and arrested Plaintiff Pender without legal basis or justification in violation of her rights under Article I, § 12 of the New York Constitution.

164.     Defendants Jane and John Does 2 through 100 have and/or will wrongfully and illegally stop, detain, and/or arrest the putative Rule (b)(2) and Rule (b)(3) class members by stopping them, demanding identification, and subjecting them to ticketing/summonses and further constraints without legal basis in violation of their rights under Article I, § 12 of the New York Constitution.

165.    The wrongful, unjustifiable and unlawful apprehension, stop, arrest, and/or detention of Plaintiffs and members of the putative Rule (b)(2) and Rule (b)(3) classes were, are and will be carried out without probable cause or reasonable suspicion, in violation of the New York Constitution.

166.    The City, through the NYPD, maintains a policy and practice of detaining and/or arresting cyclists who lawfully ride through intersections during red light traffic signals while the pedestrian light indicates white/walk.

167.    This policy and practice is so consistent and widespread that it constitutes a custom or usage of which policymakers, including the individual Commissioner Defendants, must have been aware.

168.    This policy and practice results directly from the failure by policymakers, including the individual Commissioner Defendants, to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

169.    Defendant City, as the employer of Defendant Vega and Defendants Jane and John Does 1 through 100, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

170.    As a direct and proximate result of the City's policy and practice, Plaintiffs and the putative Rule (b)(3) class members suffered damages in an amount to be proven at trial.

171.    As a direct and proximate result of the City's ongoing policy and practice, Plaintiffs and the putative Rule (b)(2) class members have and will suffer unlawful stops, arrests, and prosecution, pursued and imposed upon them without any legal basis, which must be enjoined.

172.     Because Defendants' unlawful conduct was and is knowing, purposeful, malicious, and outrageous, Plaintiffs and the putative Rule (b)(3) class members are entitled to an award of punitive damages.

## THIRD CLAIM FOR RELIEF
New York Common Law – False Arrest
(Against All Defendants)

173.     Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth herein.

174.     Defendant Vega wrongfully and intentionally arrested Plaintiffs Casey Esparza and Nasrallah when he detained Plaintiffs against their will for the purpose of subjecting Plaintiffs Casey Esparza and Nasrallah to unlawful tickets/summonses.

175.     Defendant Pessoa wrongfully and intentionally arrested Plaintiff Bloxham when he detained Plaintiff Bloxham against his will for the purpose of subjecting him to an unlawful ticket/summons.

176.     Defendant Keller wrongfully and intentionally arrested Plaintiff Gupta when he detained Plaintiff Gupta against his will for the purpose of subjecting him to an unlawful ticket/summons.

177.     Defendant Martino wrongfully and intentionally arrested Plaintiff Harper when he detained Plaintiff Harper against his will for the purpose of subjecting him to an unlawful ticket/summons.

178.     Defendant John Doe 1 wrongfully and intentionally arrested Plaintiff Lee when he detained Plaintiff Lee against his will for the purpose of subjecting him to an unlawful ticket/summons.

179.    Defendant Lall wrongfully and intentionally arrested Plaintiff Pender when she detained Plaintiff Pender against her will for the purpose of subjecting her to an unlawful ticket/summons.

180.    Plaintiffs were conscious of the unlawful confinement.

181.    Plaintiffs did not consent to the confinement.

182.    The confinement of Plaintiffs was not privileged because Defendants Vega, Pessoa, Keller, Martino, John Doe 1, and Lall lacked reasonable suspicion and/or probable cause to stop and detain Plaintiffs.

183.    Defendants Jane and John Does 2 through 100 have and/or will violate the common law rights of the putative Rule (b)(2) and Rule (b)(3) class members by, *inter alia*: stopping and falsely arresting the putative class members by detaining them for the purpose of issuing baseless and unlawful tickets/summonses, including by keeping putative class members confined and restricted against freely moving, without their consent.

184.    The City, through the NYPD, maintains a policy and practice of detaining and/or arresting cyclists who lawfully ride through intersections during red light traffic signals while the pedestrian light indicates white/walk.

185.    This policy and practice is so consistent and widespread that it constitutes a custom or usage of which policymakers, including the individual Commissioner Defendants, must have been aware.

186.    This policy and practice results directly from the failure by policymakers, including the individual Commissioner Defendants, to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

187.    Defendant City, as the employer of Defendants Vega, Pessoa, Keller, Martino, Lall and Defendants Jane and John Does 1 through 100, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

188.    As a direct and proximate result of the City's policy and practice, Plaintiffs and the putative Rule (b)(3) class members suffered damages in an amount to be proven at trial.

189.    As a direct and proximate result of the City's ongoing policy and practice, Plaintiffs and the putative Rule (b)(2) class members have and will suffer unlawful stops, arrests and prosecution, pursued and imposed upon them without any legal basis, which must be enjoined.

190.    Because Defendants' unlawful conduct was and is knowing, purposeful, malicious, and outrageous, Plaintiffs and the putative Rule (b)(3) class members are entitled to an award of punitive damages.

### FOURTH CLAIM FOR RELIEF
Common Law – Malicious Prosecution
(Against All Defendants)

191.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

192.    Defendant Vega issued Plaintiff Casey Esparza a summons that commenced a criminal proceeding against him and required that he appear in Court or face arrest for failure to comply.

193.    The criminal proceeding terminated in Plaintiff Casey Esparza's favor when the charges against him were dismissed by the court on April 15, 2025.

194.    Defendant Vega lacked probable cause to issue a summons or commence a criminal proceeding against Plaintiff Casey Esparza.

195.    Defendant Vega started the proceeding with actual malice after Plaintiff Casey Esparza advised him specifically that the stop, summons, and charges were unlawful and that crossing an intersection during a red light traffic signal while the pedestrian light indicates white/walk is permitted.

196.    Defendant John Doe 1 issued Plaintiff Lee a summons that commenced a criminal proceeding against him and required that he appear in Court or face arrest for failure to comply.

197.    The criminal proceeding terminated in Plaintiff Lee's favor when the charges against him were dismissed by the court on December 26, 2024.

198.    Defendant John Doe 1 lacked probable cause to issue a summons or commence a criminal proceeding against Plaintiff Lee.

199.    Defendant John Doe 1 started the proceeding with actual malice after Plaintiff Lee advised him specifically that the stop, summons, and charges were unlawful and that crossing an intersection during a red light traffic signal while the pedestrian light indicates white/walk is permitted.

200.    Defendants Jane and John Does 2 through 100 have and/or will violate the common law rights of the putative Rule (b)(2) and Rule (b)(3) class members by, *inter alia*, commencing criminal proceedings against the putative class members premised on baseless and unlawful charges.

201.    Defendant City, as the employer of Defendant Vega and Defendants Jane and John Does 1 through 100, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

202.   The City, through the NYPD, maintains a policy and practice of ticketing and prosecuting cyclists who lawfully ride through intersections during red light traffic signals while the pedestrian light indicates white/walk.

203.   This policy and practice is so consistent and widespread that it constitutes a custom or usage of which policymakers, including the individual Commissioner Defendants, must have been aware.

204.   This policy and practice results directly from the failure by policymakers, including the individual Commissioner Defendants, to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

205.   As a direct and proximate result of the City's policy and practice, Plaintiffs and the putative Rule (b)(3) class members suffered damages in an amount to be proven at trial.

206.   As a direct and proximate result of the City's ongoing policy and practice, Plaintiffs and the putative Rule (b)(2) class members have and will suffer unlawful ticketing and prosecution, pursued and imposed upon them without any legal basis, which must be enjoined.

207.   Because Defendants' unlawful conduct was knowing, purposeful, malicious, and outrageous, Plaintiffs and the putative class members are entitled to an award of punitive damages.

**FIFTH CLAIM FOR RELIEF**
New York City Administrative Code § 8-801 et seq.
(Against All Defendants)

208.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

209.    New York City Administrative Code § 8-802 protects each person's right to be free from unreasonable searches and seizures.

210.    New York City Administrative Code § 8-803 affords a private right of action for any deprivation of the rights protected by Section 8-802.

211.    Defendant Vega unreasonably seized Plaintiffs Casey Esparza and Nasrallah by detaining Plaintiffs against their will without reasonable suspicion or probable cause to believe that they had committed any crime, were about to commit any crime, or posed any threat of physical harm to Defendant Vega or anyone else.

212.    Defendant Pessoa unreasonably seized Plaintiff Bloxham by detaining Plaintiff Bloxham against his will without reasonable suspicion or probable cause to believe that he had committed any crime, was about to commit any crime, or posed any threat of physical harm to Defendant Pessoa or anyone else.

213.    Defendant Keller unreasonably seized Plaintiff Gupta by detaining Plaintiff Gupta against his will without reasonable suspicion or probable cause to believe that he had committed any crime, was about to commit any crime, or posed any threat of physical harm to Defendant Keller or anyone else.

214.    Defendant Martino unreasonably seized Plaintiff Harper by detaining Plaintiff Harper against his will without reasonable suspicion or probable cause to believe that he had

committed any crime, was about to commit any crime, or posed any threat of physical harm to Defendant Martino or anyone else.

215.    Defendant John Doe 1 unreasonably seized Plaintiff Lee by detaining Plaintiff Lee against his will without reasonable suspicion or probable cause to believe that he had committed any crime, was about to commit any crime, or posed any threat of physical harm to Defendant John Doe 1 or anyone else.

216.    Defendant Lall unreasonably seized Plaintiff Pender by detaining Plaintiff Pender against her will without reasonable suspicion or probable cause to believe that she had committed any crime, was about to commit any crime, or posed any threat of physical harm to Defendant Lall or anyone else.

217.    Defendants Jane and John Does 2 through 100 have and/or will unreasonably seize the putative Rule (b)(2) and Rule (b)(3) class members by detaining them against their will without reasonable suspicion or probable cause to believe they had committed any crime, were about to commit any crime, or posed any threat of physical harm to anyone.

218.    At all times, Defendants Vega, Pessoa, Keller, Martino, Lall and Jane and John Does 1 through 100 were employees of the City of New York and the NYPD acting within the scope of their employment.  Defendant City is therefore liable to Plaintiffs pursuant to New York City Administrative Code § 8-803(b).

219.    The City, through the NYPD, maintains a policy and practice of ticketing and prosecuting cyclists who lawfully ride through intersections during red light traffic signals while the pedestrian light indicates white/walk.

220.     This policy and practice is so consistent and widespread that it constitutes a custom or usage of which policymakers, including the individual Commissioner Defendants, must have been aware.

221.     This policy and practice results directly from the failure by policymakers, including the individual Commissioner Defendants, to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

222.     As a direct and proximate result of the City's policy and practice, Plaintiffs and the putative Rule (b)(3) class members suffered damages in an amount to be proven at trial.

223.     As a direct and proximate result of the City's ongoing policy and practice, Plaintiffs and the putative Rule (b)(2) class members have and will suffer unlawful ticketing and prosecution, pursued and imposed upon them without any legal basis, which must be enjoined.

224.     Because Defendants' unlawful conduct was knowing, purposeful, malicious, and outrageous, Plaintiffs and the putative class members are entitled to an award of punitive damages.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court grant the following relief:

a.     Declare that the suit is maintainable as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2) and (b)(3);

b.     Declare that Defendants have committed the violations of law alleged in this action;

c.     Issue an order preliminarily and permanently enjoining and directing Defendants to cease detaining, arresting, ticketing, issuing summons to, charging, or prosecuting individuals

for cycling through intersections while the pedestrian light indicates white/walk; and to take appropriate ameliorative measures to ensure that no one is detained, arrested, ticketed, issued a summons, charged, or prosecuted for cycling through an intersection while the pedestrian light indicates white/walk, including without limitation:

1. Directing Defendants to immediately communicate to all members of the NYPD that cyclists are lawfully permitted to cross an intersection during red light traffic signals while the pedestrian light indicates white/walk;

2. Directing Defendants to develop and implement appropriate immediate training to be provided to all current and future members of the NYPD making clear that cyclists may not be detained, arrested, ticketed, issued summonses, charged, or prosecuted for crossing an intersection during red light traffic signals while the pedestrian light indicates white/walk;

3. Directing Defendants to issue policies and procedures to ensure that cyclists are not detained, arrested, ticketed, issued summonses, charged, or prosecuted for crossing intersections during red light traffic signals while the pedestrian light indicates white/walk; and

4. Establishing a system for tracking arrests, tickets, and summonses issued to cyclists for red light violations which indicates whether the pedestrian signal was white or red at the time of the alleged violation.

d.    Award compensatory damages in an amount to be determined for all physical, psychological, mental, emotional, and economic injuries, as well as loss of liberty, sustained by Plaintiffs and the Rule 23(b)(3) class as a result of the policies and practices alleged herein;

e.    Award punitive damages;

f.      Award reasonable attorneys' fees, together with the costs of this action; and

g.      Grant such other further relief as the Court may deem appropriate.

Dated:  July 30, 2025
      New York, New York

Respectfully submitted,

WANG HECKER LLP

By: _____
     Mariann Meier Wang
     Eric Hecker
     Alexander Goldenberg
     Daniel Mullkoff
     Lily Sawyer-Kaplan
     305 Broadway, Sixth Floor
     New York, New York 10007
     (212) 620-2600

     *Attorneys for Plaintiffs and the Putative Class*