UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

OLIVER CASEY ESPARZA; PHILLIP NASRALLAH;
WILLIAM THOMAS BLOXHAM; ANKIT GUPTA; JAY
HARPER; RICHARD LEE; and KATHERINE PENDER,
on their own behalf and on behalf of others similarly
situated,

Plaintiffs,

v.

CITY OF NEW YORK; JESSICA S. TISCH;
POLICE OFFICER KENNEY F. VEGA;
POLICE OFFICER JONATHAN A. PESSOA;
POLICE OFFICER THOMAS J. KELLER;
POLICE OFFICER GIOVANNI P. MARTINO;
POLICE OFFICER SHAYE LALL;
and JOHN/JANE DOES 1-100,

Defendants.

---

Case No. 25 Civ. 3815 (DLC)

**SECOND AMENDED
CLASS ACTION
COMPLAINT**

**JURY TRIAL DEMANDED**

Plaintiffs Oliver Casey Esparza, Phillip Nasrallah, William Thomas Bloxham,

Ankit Gupta, Jay Harper, Richard Lee, and Katherine Pender, by and through their attorneys,

Wang Hecker LLP, for their class action Second Amended Complaint allege as follows:

## <u>NATURE OF THE ACTION</u>

1.      This action arises from the unconstitutional policy and practice of the City of New

York (the "City") of detaining, ticketing, and prosecuting cyclists for an action that is expressly

permitted by New York City law:  riding a bicycle through an intersection when the traffic signal

is red but the pedestrian signal indicates white/walk.

2.      As part of the City's initiative to reduce pedestrian and bicycle injuries and

deaths, the City has implemented Leading Pedestrian Intervals ("LPI") at thousands of

intersections.  An LPI gives pedestrians the white/walk signal while the traffic signal is still red, allowing pedestrians to enter the crosswalk at an intersection several seconds before vehicles are given a green light, thereby enabling pedestrians to establish their presence in the crosswalk before vehicles are allowed to turn right or left.

3.     The City has also implemented Exclusive Pedestrian Signals, which have an interval that stops traffic in all directions, giving pedestrians and cyclists an exclusive time to cross the street.

4.     In 2019, the New York City Council enacted Local Law 154, which expressly provides that a person operating a bicycle while crossing an intersection shall follow pedestrian control signals (walk/don't walk), not traffic control signals (red/yellow/green).

5.     Despite this clear and unambiguous statute, the City maintains a policy and practice of detaining, ticketing, and prosecuting cyclists who lawfully ride through an intersection when the pedestrian control signal indicates white/walk.

6.     Plaintiffs Oliver Casey Esparza and Phillip Nasrallah both commuted to work by bicycle, separately, on October 1, 2024.  Both of them entered the intersection of Third Avenue and East 42nd Street in Manhattan during an LPI.  Defendant NYPD Officer Kenney F. Vega unlawfully detained both Mr. Casey Esparza and Mr. Nasrallah and unlawfully issued them summonses – even though Officer Vega expressly acknowledged that the pedestrian signal had indicated white/walk when they entered the intersection, and even though Mr. Casey Esparza expressly told Officer Vega that New York City permitted him to enter the intersection in that circumstance.

7.     Plaintiff William Thomas Bloxham went for a ride on his bicycle to get exercise on November 20, 2024.  He was riding south on Tompkins Avenue in Brooklyn, approaching the

intersection of Dekalb Avenue, when he proceeded through the light during an LPI and was unlawfully detained and issued a summons by Defendant Police Officer Jonathan A. Pessoa.  Mr. Bloxham informed Defendant Pessoa that he had crossed with the pedestrian light.  Defendant Pessoa responded, in substance, that it did not matter "because a bicycle was like a car" for purposes of crossing the street.

8.      Plaintiff Ankit Gupta commuted home by bicycle on May 20, 2025.  He entered the intersection of Grand Avenue and East 69th Street in Woodside, Queens during an LPI. Defendant Police Office Thomas J. Keller unlawfully detained Mr. Gupta and unlawfully issued him a summons.  Mr. Gupta explained that he had crossed with the pedestrian light and that doing so had been lawful under New York City law since 2019, but Defendant Keller responded, in substance, "We know the law."

9.      Plaintiff Jay Harper commuted by bicycle to a medical appointment on April 5, 2024.  He entered the intersection of Manhattan Avenue and West 122nd Street in Manhattan during an LPI.  Defendant Police Officer Giovanni P. Martino unlawfully detained Mr. Harper and unlawfully issued him a summons.  Mr. Harper stated to Defendant Martino that he had crossed with the pedestrian light and told him that it is legal to do so, but Defendant Martino insisted, "No it's not."

10.     Plaintiff Richard Lee commuted by bicycle on September 4, 2024.  He entered the intersection of Thomas S. Boyland Street and Pitkin Avenue in Brooklyn during an LPI. Defendant NYPD Officer John Doe 1 detained him and unlawfully issued him a summons.  Mr. Lee asked Defendant NYPD Officer John Doe 1 if he was aware of the LPI law, and he responded that he was not.

11.     Plaintiff Katherine Pender was traveling home by Citi Bike e-bike on June 4, 2025.  She entered the intersection of Lexington Avenue and East 50th Street in Manhattan during an LPI.  Defendant NYPD Officer Shaye Lall and three other Defendant NYPD Officers unlawfully detained her and issued her a summons.  Ms. Pender informed the officers that she began cycling through the intersection only after the pedestrian light changed to white.

12.     The City and its police officers have engaged and continue to engage in the same unlawful behavior, over and over, detaining, ticketing, and prosecuting hundreds or thousands of law-abiding New Yorkers for riding bicycles through intersections at the safest time to do so.

13.     This action seeks redress for Plaintiffs and a class of similarly situated individuals, and to advance the significant public interest, embodied in New York City's Vision Zero initiative, in avoiding injury and death on public roadways.  Defendants should be enjoined from engaging in this blatantly unlawful practice once and for all and should pay damages to compensate Plaintiffs and the class for their false arrests and wrongful prosecutions.

## JURISDICTION AND VENUE

14.     This action arises under 42 U.S.C. §§ 1983 and 1988 and the Fourth and Fourteenth Amendments to the United States Constitution.

15.     The jurisdiction of this Court is predicated on 28 U.S.C. §§ 1331, 1343, 2201, and 2202.

16.     This Court has supplemental jurisdiction over Plaintiffs' claims under state and local law pursuant to 28 U.S.C. § 1367 because those claims closely relate to the federal claims, having arisen from a common nucleus of operative facts, such that the state and local law claims form part of the same case or controversy.

17.     Venue is appropriate in this Court pursuant to 28 U.S.C. § 1391(b) because a substantial portion of the acts complained of occurred in the Southern District of New York.

### JURY DEMAND

18.     Plaintiffs demand a trial by jury in this action.

### PARTIES

19.     Plaintiff Oliver Casey Esparza is a natural person who resides in North Carolina.

20.     Plaintiff William Thomas Bloxham is a natural person who resides in Kings County, New York.

21.     Plaintiff Ankit Gupta is a natural person who resides in Queens County, New York.

22.     Plaintiff Jay Harper is a natural person who resides in New York County, New York.

23.     Plaintiff Richard Lee is a natural person who resides in Kings County, New York.

24.     Plaintiff Philip Nasrallah is a natural person who resides in New York County, New York.

25.     Plaintiff Katherine Pender is a natural person who resides in New York County, New York.

26.     Defendant City of New York (the "City") is a municipality organized and existing under the laws of the State of New York.  At all relevant times, the City, acting through the New York City Police Department (the "NYPD"), was responsible for formulating, implementing, and supervising all police policies and practices and was responsible for the appointment, training, and supervision of all police personnel.  At all relevant times, the City was responsible for

ensuring that NYPD personnel obey the laws of the City, the State of New York, and the United States Constitution.

27.     Defendant Jessica S. Tisch is the Commissioner of the NYPD.  As such, she is the person chiefly and ultimately responsible for formulating, implementing, and supervising NYPD policies and practices.  At all relevant times, she was acting within the scope of her employment under color of law.  She is sued in her individual and official capacities.

28.     Defendant Police Officer Kenney F. Vega is an NYPD Officer.  At all times relevant hereto, Defendant Vega was a police officer employed by the NYPD, acting in the capacity of an agent, servant, and employee of defendant City, and within the scope of his employment as such, and acting under color of law.  Defendant Vega is sued in his individual capacity.

29.     Defendant Police Officer Jonathan A. Pessoa is an NYPD Officer.  At all times relevant hereto, Defendant Pessoa was a police officer employed by the NYPD, acting in the capacity of an agent, servant, and employee of defendant City, and within the scope of his employment as such, and acting under color of law.  Defendant Pessoa is sued in his individual capacity.

30.     Defendant Police Officer Thomas J. Keller is an NYPD Officer.  At all times relevant hereto, Defendant Keller was a police officer employed by the NYPD, acting in the capacity of an agent, servant, and employee of defendant City, and within the scope of his employment as such, and acting under color of law.  Defendant Keller is sued in his individual capacity.

31.     Defendant Police Officer Giovanni P. Martino is an NYPD Officer.  At all times relevant hereto, Defendant Martino was a police officer employed by the NYPD, acting in the

capacity of an agent, servant, and employee of defendant City, and within the scope of his employment as such, and acting under color of law.  Defendant Martino is sued in his individual capacity.

32.     Defendant Police Officer Shaye Lall is an NYPD Officer.  At all times relevant hereto, Defendant Lall was a police officer employed by the NYPD, acting in the capacity of an agent, servant, and employee of defendant City, and within the scope of her employment as such, and acting under color of law.  Defendant Lall is sued in her individual capacity.

33.     Defendant John/Jane Does 1-100 are NYPD officers or supervisors.  At all times relevant hereto, Defendant John/Jane Does 1-100 were police officers or supervisors employed by the NYPD, acting in the capacity of an agent, servant and employee of defendant City, and within the scope of their employment as such, and acting under color of law.  Defendant John/Jane Does 1-100 are sued in their individual capacities.

## FACTUAL ALLEGATIONS

The "Go With the Walk" Law

34.     According to the New York City Department of Transportation ("DOT"), the number of people commuting by bicycle in the City has risen dramatically over the past two decades, increasing from approximately 15,000 daily commuters in 2000 to approximately 61,000 daily commuters in 2023.

35.     The City launched its "Vision Zero" initiative in 2014 with the aim of eliminating traffic fatalities and injuries.  But despite some meaningful improvements as a result of those efforts – particularly for pedestrian safety – cycling in New York City remains highly dangerous. For example, 2023 saw the highest number of cyclist fatalities since 1999.

36.     As part of the Vision Zero initiative, the City has since 2014 prioritized installing "Leading Pedestrian Intervals" at thousands of intersections.  A "Leading Pedestrian Interval" or LPI is a system in which the pedestrian signal turns to white/walk several seconds before the traffic signal turns green, which gives pedestrians and cyclists a head start when crossing the intersection.  This allows pedestrians and cyclists to be visible to drivers, as they are already crossing by the time the drivers are permitted to move.

37.     In 2016, the DOT published a study regarding pedestrian and bicyclist injuries as a result of crashes with motor vehicles turning left.  The study found that LPIs significantly reduced the number of pedestrians and cyclists injured or killed by left-turning vehicles.[1]

38.     In 2019, the DOT published the results of a pilot program in which cyclists were permitted to cross on the LPI at 50 intersections around the City.  DOT found that "the vast majority of people biking currently proceed on the LPI and no conflicts or near misses were observed."  DOT therefore recommended that cyclists be allowed to follow pedestrian signals citywide, provided that users yield to pedestrians and that DOT could exempt certain intersections through signage.[2]

39.     Heeding this DOT recommendation, in 2019, the New York City Council enacted Local Law 154, which amended the New York City Administrative Code to make clear that cyclists are permitted to cross intersections when the pedestrian signal shows a white/walk signal:

> A person operating a bicycle while crossing an intersection shall follow pedestrian control signals except where otherwise indicated by traffic control devices, and provided that such person shall yield to pedestrians in the crosswalk.

---

[1] *See* https://www.nyc.gov/html/dot/downloads/pdf/left-turn-pedestrian-and-bicycle-crash-study.pdf.
[2] *See* https://www.nyc.gov/html/dot/downloads/pdf/bike-lpi-study-memo.pdf.

N.Y.C. Admin. Code 19-195.1(b).  This law went into effect on December 21, 2019.

40.     The City has engaged in widespread public awareness efforts to inform cyclists of this law so that they will take advantage of it and thus be safer.

41.     The City's Vision Zero website states:

> Since 2019, cyclists have been allowed to use leading pedestrian intervals (LPIs), meaning they can go through a red light when the parallel pedestrian signal changes to "walk." This is a safe way to reduce stressful interactions at intersections.[3]

42.     Similarly, both the DOT's official NYC Bike Map and a DOT publication called "Bike Laws" instruct cyclists to "Go with the walk," stating that "Unless there is a bike signal or sign, cross the intersection when the pedestrian signal shows the 'walk'":



.[4]

43.     The law has been clearly established at least since 2019 that cyclists in New York City are permitted to cross intersections during red light traffic signals while the pedestrian light indicates white/walk, including during LPIs.

---

[3] *See* https://www.nyc.gov/content/visionzero/pages/bicycles.
[4] *See* https://www.nyc.gov/html/dot/downloads/pdf/nyc-bike-map-2024.pdf and https://www.nyc.gov/html/dot/downloads/pdf/bike-laws.pdf.

The City's Unlawful Policy and Practice

44.     The City, through the NYPD, maintains a policy and practice of detaining, ticketing, and prosecuting cyclists who lawfully ride through intersections during red light traffic signals while the pedestrian light indicates white/walk.

45.     This policy and practice is so consistent and widespread that it constitutes a custom or usage of which supervising policymakers must have been aware.

46.     This policy and practice results directly from the failure by policymakers to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

Plaintiffs Oliver Casey Esparza and Phillip Nasrallah

47.     Plaintiff Oliver Casey Esparza lived and worked in Manhattan until September 2025.  He frequently commuted to work by bicycle.

48.     Plaintiff Phillip Nasrallah lives and works in Manhattan.  He has frequently commuted to work by bike.

49.     On October 1, 2024, Mr. Casey Esparza biked to work, as did Mr. Nasrallah, separately.  At approximately 8:37 AM, both Mr. Casey Esparza and Mr. Nasrallah arrived at the intersection of East 42nd Street and Third Avenue in Manhattan and stopped.  After the LPI light turned to a white signal, indicating that it was permissible to cross, both Mr. Casey Esparza and Mr. Nasrallah crossed the intersection going westbound on 42nd Street.  No pedestrians or vehicles were in or near their path, and both the pedestrian and vehicle signals on the perpendicular street (Third Avenue) were red at the time they crossed the intersection.

50.     Plaintiffs Casey Esparza and Nasrallah were both stopped by Defendant Police Officer Vega, who indicated that he was stopping both of them for going through the red traffic light.  Mr. Casey Esparza told Defendant Vega that the pedestrian signal had been white, and explained that under applicable law bicycles are permitted to cross intersections when the pedestrian signal is white.  Defendant Vega expressly acknowledged that the pedestrian signal had been white when Mr. Casey Esparza had crossed the intersection but said that he was "99% sure" that Mr. Casey Esparza was wrong about the law.

51.     Plaintiffs Casey Esparza and Nasrallah both understood that their freedom of movement was constrained and that they were not free to leave or to continue biking to work when they were stopped by Defendant Vega.

52.     After Defendant Vega unlawfully stopped Plaintiffs Casey Esparza and Nasrallah, Defendant Vega demanded that Plaintiffs Casey Esparza and Nasrallah produce identification and then wait.

53.     Plaintiffs Casey Esparza and Nasrallah both understood that they were not free to leave until Defendant Vega finished writing out the tickets/summonses and returned their identification documents to them.

54.     Defendant Vega issued Plaintiff Casey Esparza a Traffic Violation that stated that "BICYCLE FAILED TO YIELD TO VEH/PEDESTRIAN AT RED LIGHT-NYC" and indicated that Casey had violated Section "4-03(A)(3)(II)" of the New York City Traffic Rules and Regulations ("NYCTRR").  (That subsection concerns intersections where signs expressly indicate that right or left turns on red signals are permissible, so it did not even apply to the alleged violation.)

55.     Defendant Vega issued Plaintiff Nasrallah a Traffic Violation that stated that "BICYCLE FAILED TO YIELD TO VEH/PEDESTRIAN AT RED LIGHT-NYC" and indicated that Nasrallah had violated the same plainly inapplicable subsection, Section "4-03(A)(3)(II)" of the NYCTRR.

56.     Plaintiff Casey Esparza had a hearing for the violation on April 15, 2025 before the New York State Department of Motor Vehicles ("DMV") Administrative Adjudication Bureau.  The judge dismissed the violation at that hearing.

57.     At that hearing, Defendant Vega confirmed in his sworn testimony that his understanding of the law was that "In New York City, moped, scooters, e-bikes, motorbikes must follow the same traffic rules, traffic devices, as vehicles."

58.     After Mr. Casey Esparza testified that he had "proceeded through the red light on the leading pedestrian interval, as — as per the guidelines of the 2019 law change," the DMV Administrative Judge noted, "I'm aware of the LPS, yes" [sic] and stated on the record, "I'm going to find not guilty here."  In so ruling, the Administrative Judge confirmed that he was finding Mr. Casey Esparza not guilty because he had proceeded while the pedestrian signal showed walk, complied with the LPI statute, and not violated the law.

59.     Plaintiff Nasrallah was given a court date for the violation he was issued, but it has been adjourned multiple times and remains pending.

Plaintiff William Thomas Bloxham

60.     Plaintiff William Thomas Bloxham went for a ride on his bicycle to get exercise on November 20, 2024.

61.      At approximately 8:56 AM, he was riding south on Tompkins Avenue in Brooklyn during his return trip home.

62.    When he reached the intersection of Tompkins Avenue and Dekalb Avenue, Mr. Bloxham stopped at the red light and waited for the signal to change.  He then proceeded through the light during an LPI.  No pedestrians were present in the intersection when Mr. Bloxham crossed the street.

63.    A police cruiser with flashing lights and siren pulled over Mr. Bloxham after he crossed the intersection.  Defendant Police Officer Jonathan Pessoa demanded to see Mr. Bloxham's identification.  Mr. Bloxham did not have identification because he had not brought his driver's license with him to exercise on his bicycle.

64.    Defendant Pessoa compelled Mr. Bloxham to wait and prevented him from leaving or returning home until Mr. Bloxham identified himself to Defendant Pessoa's satisfaction.  Defendant Pessoa ultimately allowed Mr. Bloxham to identify himself through information on his phone.

65.    Mr. Bloxham informed Defendant Pessoa that he had lawfully crossed the intersection with the pedestrian light.  Defendant Pessoa responded, in substance, that it did not matter "because a bicycle was like a car" for purposes of traffic signal rules.

66.    Mr. Bloxham understood during his entire interaction with Defendant Pessoa, which lasted for approximately 10 to 15 minutes, that he was not free to leave until Defendant Pessoa identified Mr. Bloxham to his satisfaction, finished writing out a summons, and granted Mr. Bloxham permission to leave.  The situation was extremely stressful for Mr. Bloxham who needed to return home promptly to catch a train for the Thanksgiving holiday.

67.    Defendant Pessoa issued Mr. Bloxham a traffic ticket for allegedly crossing an intersection on a red light, in violation of Section 1110(a) and (b) of the Vehicle and Traffic Law.

68.     Mr. Bloxham has pled not guilty and is presently awaiting his hearing, which has repeatedly been postponed.  The hearing is currently scheduled for April 17, 2026, nearly 18 months after Mr. Bloxham received his summons.

Plaintiff Ankit Gupta

69.     On May 20, 2025, Plaintiff Ankit Gupta was biking home from Manhattan to his residence in Jackson Heights, Queens at approximately 10:14 PM.

70.     Mr. Gupta crossed the intersection of Grand Avenue and East 69th Street in Woodside, Queens during an LPI.

71.     Two NYPD officers, including Defendant Police Officer Thomas J. Keller, then pulled him over in a police car.  Defendant Keller demanded Mr. Gupta's identification and ordered him to wait.

72.     Defendant Keller asked Mr. Gupta if he had crossed the intersection during a red light, and Mr. Gupta said that he had crossed with the pedestrian light.  Defendant Keller said, in substance, "You're not a pedestrian."  Mr. Gupta said that there has been a law since 2019 that permits bikes to cross during the pedestrian light.  Defendant Keller said, in substance, "We know the law," and that "we're letting you off with a non-moving violation."

73.     Defendant Keller issued Mr. Gupta a traffic ticket alleging a failure to stop at a red light in violation of Section 1111(d)(1) of the Vehicle and Traffic Law.

74.     Mr. Gupta was detained for approximately 15 minutes before Defendant Keller permitted him to leave.  Mr. Gupta understood that he was not free to leave until Defendant Keller finished writing out the summons and returned his identification to him.

75.     Mr. Gupta's court date for the ticket is scheduled to occur on June 2, 2026, more than a year after the incident.

Plaintiff Jay Harper

76.     At approximately 9:00 AM on April 5, 2024, Plaintiff Jay Harper rode his bicycle in Harlem, where he lives, to a medical appointment.

77.     When Mr. Harper arrived at the intersection of Manhattan Avenue and West 122nd Street, the pedestrian light was white, so Mr. Harper carefully proceeded through the intersection.

78.     Defendant Police Officer Giovanni P. Martino, driving southbound and stopped at a light, pulled Mr. Harper over in a police car.

79.     Defendant Martino ordered Mr. Harper to produce identification and wait.

80.     Mr. Harper stated to Defendant Martino that he had crossed with the pedestrian light and told him that it is legal to do so, but Defendant Martino insisted, "No it's not."  A second police officer joined Defendant Martino, and the two officers proceeded to ask Mr. Harper repeatedly what color the traffic light had been when he crossed the intersection.  Mr. Harper responded each time that the pedestrian light had indicated walk.

81.     During the stop, Mr. Harper pulled up a news article on his phone about the 2019 LPI law, but Defendant Martino refused even to look at it.

82.     Defendant Martino issued Mr. Harper a traffic ticket for allegedly crossing an intersection on a red light, in violation of Section 1110(a) and (b) of the Vehicle and Traffic Law.

83.     Mr. Harper was detained for approximately 15 minutes before Defendant Martino permitted him to leave.  Mr. Harper understood that he was not free to leave until Defendant Martino finished writing out the summons and returned his identification to him.

84.     Mr. Harper's court date for the ticket is scheduled for March 31, 2026.

85.    Less than three weeks before that incident, a cyclist had been killed at the intersection of Manhattan Avenue and West 122nd Street when he was struck by a postal truck. Upon information and belief, NYPD officers were monitoring that intersection as a result of that incident.

86.    Rather than taking steps to ensure that the site of the fatal incident was safer for cyclists, Defendant Martino did precisely the opposite, detaining and ticketing Mr. Harper for following the safest practice of crossing during the LPI.

Plaintiff Richard Lee

87.    Plaintiff Richard Lee commuted to work by bicycle on September 4, 2024.

88.    During his commute, Mr. Lee entered the intersection of Thomas S. Boyland Street and Pitkin Avenue in Brooklyn during an LPI.

89.    Defendant NYPD Officer John Doe 1 pulled Mr. Lee over in a police car and ordered him to produce identification.

90.    Mr. Lee asked Defendant John Doe 1 whether he was aware of the New York City law that permits cyclists to cross during LPIs.  The officer responded that he was not aware of it but would look it up later.

91.    Defendant John Doe 1 then issued Mr. Lee a summons for allegedly running a red light.

92.    Mr. Lee was detained for approximately 10 to 15 minutes before Defendant John Doe 1 permitted him to leave.  Mr. Lee understood that he was not free to leave until Defendant John Doe 1 finished writing out the summons and returned his identification to him.

93.    A virtual hearing was scheduled for Mr. Lee's summons on December 26, 2024. The violation was dismissed that day prior to the hearing.

Plaintiff Katherine Pender

94.    Plaintiff Katherine Pender was traveling home by Citi Bike e-bike on June 4, 2025.

95.    She entered the intersection of Lexington Avenue and East 50th Street in Manhattan during an LPI.

96.    Defendant Shaye Lall ran out in front of her bike in the middle of the intersection.

97.    Three other Defendant NYPD Officers joined Defendant Lall and surrounded Ms. Pender.  Defendant Lall ordered Ms. Pender to provide identification, and she held onto it while Ms. Pender waited.

98.    A larger group of Defendant NYPD Officers observed the encounter.

99.    Ms. Pender informed the officers that she began cycling through the intersection only after the pedestrian light changed to white.  Nevertheless, the Defendant NYPD Officers lectured her about how she could have killed someone.

100.    Defendant Lall then issued Ms. Pender a summons for allegedly running a red light.

101.    Ms. Pender was detained for approximately 10 minutes.  Ms. Pender understood that she was not free to leave until Defendant Lall finished writing out the summons and returned Ms. Pender's identification.

102.    Ms. Pender's summons was dismissed on June 23, 2025.

103.    With respect to each of the Plaintiffs' interactions described above, all objective indicators and communications from the officer Defendants, explicit and implicit, established that the Plaintiffs were not free to leave until the officer Defendants indicated that they may do so.  The officer Defendants communicated such through their words and actions, including

without limitation by indicating and/or expressly telling Plaintiffs to wait while the officer Defendants held onto the Plaintiffs' identification cards and stepped away from the Plaintiffs while they wrote out summonses by hand or generated summonses by entering data into and generating printouts from equipment in their vehicles.

104.    During each of these incidents, it was evident from all objective circumstances that had Plaintiffs left or attempted to leave without permission from the officer Defendants, they would have been detained for even longer and charged with additional violations or crimes.

<u>Plaintiffs Are Likely to Be Subjected to Additional Unlawful Conduct by Defendants</u>

105.    The named Plaintiffs continue to bicycle routinely and regularly throughout New York City.[5]  In order to reduce their risk of being injured or killed by a motor vehicle, each of the Plaintiffs continues lawfully to cycle across intersections with LPI signals that permit their cycling across the intersection during the LPI but when the traffic light is red.

106.    City data shows that among the areas in which NYPD officers issue summonses to cyclists for failing to obey red lights at a particularly high rate are "north-south corridors in Manhattan," and other routes in Manhattan, Brooklyn, and Queens, in which several of the Plaintiffs frequently travel by bicycle.[6]  On information and belief, many of those summonses are based on lawful conduct in which the cyclist crossed with the pedestrian signal.

107.    Plaintiff Thomas Bloxham regularly travels by bicycle in Brooklyn, including when commuting multiple times each week from Bedford-Stuyvesant to Gowanus for work.  In doing so, he generally travels on streets with bike lanes or shared bike lanes, and his route passes

---

[5] Plaintiff Casey Esparza moved out of New York after this case was filed.  He no longer seeks injunctive relief.

[6] https://nyc.streetsblog.org/2025/05/06/as-nypds-criminal-crackdown-on-cyclists-expands-it-grows-more-absurd-victims; the map is available at: https://charliedek.github.io/tickets/.

through multiple intersections and areas that are subject to significantly higher rates of NYPD officers ticketing cyclists than the City overall. For example, Mr. Bloxham regularly travels through intersections on Dekalb Avenue, Lafayette Avenue, Vanderbilt Avenue, Bergen Street, and Third Street in Brooklyn that are subject to significantly higher rates of NYPD officers ticketing cyclists. In one two-block stretch of Vanderbilt Avenue that Plaintiff Bloxham regularly travels (between Fulton Street and Atlantic Avenue), NYPD officers issued cyclists more than 40 tickets for red light violations in the first 6 months of 2025 alone. Likewise, at the intersection of Third Street and Third Avenue, which Plaintiff Bloxham regularly traverses, NYPD officers issued cyclists two dozen such tickets in the first six months of 2025.

108.    Plaintiff Pender bikes in Manhattan roundtrip to work approximately six times per week. In doing so, she frequently travels north on First Avenue in Midtown, and west on 51st Street, throughfares that are subject to significantly higher rates of NYPD officers ticketing cyclists than the City overall. For example, on one block of East 51st Street alone – which Plaintiff Pender bikes frequently as part of her commute – in the first six months of 2025, NYPD officers issued more than 450 summonses to cyclists for failing to obey red lights (and nearly 900 summonses to cyclists overall). Approximately twice a month, Plaintiff Pender also bikes on First Avenue to see family on Third Ave and 31st Street in Manhattan.

109.    Plaintiff Ankit Gupta regularly travels by bicycle to and from his home in Jackson Heights, Queens, passing through numerous intersections and areas that are the subject of significantly higher rates of NYPD officers ticketing cyclists than the City overall, including at and near the intersection where Mr. Gupta was ticketed for crossing during an LPI. Plaintiff Gupta commutes to work in SoHo, Manhattan approximately three times a week, and as part of that commute often bikes down Second Avenue. He frequently takes an alternative route to and

from work and bikes across the Williamsburg Bridge. During that commute, he often sees officers on Delancey Street issuing tickets to cyclists. In the first half of 2025, on the Manhattan side of the Williamsburg Bridge, officers issued well over 100 summonses to cyclists for failing to obey red lights.

110.    Plaintiff Gupta also travels by bicycle approximately one or two additional times per week along Steinway Street, Roosevelt Ave, and Northern Boulevard in Queens and along Grand Street in Brooklyn. Second Avenue, Delancey Street, Steinway Street, Roosevelt Ave, Northern Boulevard, and Grand Street were all among the 14 corridors that were specifically identified by the NYPD in April 2025 as the focus of increased enforcement against cyclists.[7]

111.    Plaintiff Jay Harper regularly travels by bicycle in Harlem, including passing through numerous intersections and areas that are subject to significantly higher rates of NYPD officers ticketing cyclists than the City overall. In the first six months of 2025 alone, NYPD officers issued more than 300 summonses to cyclists for failing to obey red lights (and nearly 700 summonses to cyclists overall) in the immediate vicinity of the intersection of Manhattan Avenue and West 122nd Street, where Plaintiff Harper was ticketed for crossing during an LPI. He also frequently travels by bicycle on Seventh Avenue, Fifth Avenue, and Lenox Avenue in Harlem.

112.    Plaintiff Phillip Nasrallah travels by bicycle approximately twice a week from Midtown East to Chelsea, and in doing so travels on thoroughfares that are subject to significantly higher rates of NYPD officers ticketing cyclists than the City overall, including Second Avenue, which was specifically identified by the NYPD in April 2025 as one of 14

---

[7] https://nyc.streetsblog.org/2025/05/02/policy-change-nypd-will-write-criminal-summonses-not-traffic-tickets-for-cyclists.

corridors that would be the focus of increased enforcement against cyclists.  Approximately once a week he travels by bicycle on Third Avenue between Midtown East and the Upper East Side.

113.    Plaintiff Richard Lee commutes to work by bicycle four times a week.  Two to three times a week, he travels from Park Slope, Brooklyn to Queens.  As part of his route, Plaintiff Lee bikes along Vanderbilt Avenue from Dean Street to the Brooklyn Navy Yard, a stretch where NYPD officers issued 71 summonses to cyclists for red light violations in the first half of 2025.  Once a week, Plaintiff Lee travels by bicycle along Northern Boulevard in Queens, an NYPD enforcement hotspot where NYPD officers issued nearly 200 summonses to cyclists in the first half of 2025 for failing to obey red lights.

114.    Given the Plaintiffs' frequent cycling in New York City, Defendants' ongoing policy and practice of issuing tickets and/or criminal summonses for cycling across an intersection when the traffic light is red and the pedestrian light indicates white/walk, and Defendants' recent policy of increasing its crackdown on cyclists, including in particular in the areas of Manhattan, Queens, and Brooklyn in which several Plaintiffs frequently travel, Plaintiffs are likely to be unlawfully ticketed again in the immediate future.

## **CLASS ALLEGATIONS**

115.    With respect to the injunctive claims, Plaintiffs brings this action on their own behalf and, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), and (b)(2), on behalf of:

> All individuals who have been or will be detained, arrested, ticketed, and/or prosecuted for cycling through an intersection in New York City while the pedestrian light indicated white/walk.

116.    Defendants have acted, or failed to act, on grounds generally applicable to the Rule (b)(2) Class, thereby making appropriate final injunctive relief with respect to the Rule (b)(2) Class as a whole.

117.    With respect to their damages claims, Plaintiffs bring this action on their own behalf and, pursuant to Federal Rules of Civil Procedure 23(a), 23(b)(1), and (b)(3), on behalf of:

> All individuals who were detained, arrested, ticketed, and/or prosecuted for cycling through an intersection in New York City while the pedestrian light indicated white/walk during the fullest period permitted by the applicable statute of limitations.

118.    The Rule (b)(2) and Rule (b)(3) classes are each so numerous that joinder of all members is impracticable.  Upon information and belief, during the past three years, hundreds of cyclists have been ticketed by the NYPD for crossing intersections while the pedestrian light indicated white/walk, and currently and in the future, many dozens, if not hundreds of cyclists are being subjected to and will be subjected to being stopped, ticketed/summoned, and subjected to unlawful prosecution.

119.    Numerous incidents of such unlawful ticketing have been documented in recent years.

120.    In June 2021, NYPD Officer Jessica Ricotta ticketed a cyclist at 30th Avenue and 21st Street in Astoria for crossing an intersection during an LPI.[8]

121.    In November 2021, Officer Ricotta ticketed another cyclist at the same intersection for crossing during an LPI.[9]

122.    In June 2022, NYPD Officer James Mariconi ticketed cyclist Andrea Adleman for crossing the intersection of 41st Street and Sixth Avenue in Manhattan during an LPI.[10]

---

[8] *See* https://nyc.streetsblog.org/2021/11/15/courtesy-professional-and-disrespect-nypd-tickets-e-bike-riders-for-legally-following-pedestrian-signal.
[9] *Id.*
[10] *See* https://nyc.streetsblog.org/2023/12/13/cyclist-takes-nypd-to-court-over-improper-red-light-tickets.

123.    In September 2022, cyclist Darren Goldner was ticketed for crossing an intersection on Fourth Avenue in Sunset Park, Brooklyn during an LPI.[11]

124.    On or about March 18, 2024, cyclist Margaret Tyre was ticketed for crossing an intersection in Park Slope, Brooklyn during an LPI.  Ms. Tyre paid the ticket because she did not have time to fight it.

125.    In July 2024, cyclist Tim M. was ticketed for crossing multiple intersections at a traffic circle in upper Manhattan while the traffic lights were red.  At each light, Mr. M. entered the intersection while the pedestrian signal showed white/walk.

126.    After being stopped, Mr. M. explained to the two officers who pulled him over that he had crossed with the LPI in each instance.  The officers repeatedly – and incorrectly – insisted that Mr. M. was required to obey the vehicular traffic signal and that he was mistaken about his right to cross with the LPI.

127.    Subsequent to the stop, Mr. M. obtained the officers' body-worn camera footage recording his interaction with the police.  The footage confirms unequivocally that both officers were mistaken about the law, that Mr. M. attempted calmly to explain their error, and that the officers refused to accept his explanation.

128.    Confirming the NYPD's systematic failure to train as alleged herein, the body-worn camera footage captured an interaction between the officers inside of their NYPD vehicle after Mr. M. explained the LPI law.  The officers discussed among themselves whether Mr. M. was correct that he was permitted to cross with the pedestrian signal even if the traffic light remained red.  The officers concluded incorrectly during their conversation that the bicycle was

---

[11] *See* https://nyc.streetsblog.org/2022/09/06/the-nypd-and-dmv-are-punishing-cyclists-for-legally-crossing-with-the-pedestrian-signal.

subject to vehicular traffic rules and that Mr. M. could not cross with the pedestrian signal.  Mr. M. has challenged his tickets, but his hearing dates have been repeatedly postponed.

129.    On or about July 21, 2024, cyclist Zane Markosian was ticketed for crossing an intersection in Clinton Hill, Brooklyn during an LPI.  Mr. Markosian explained to the NYPD officer at the time that cyclists are legally permitted to cross with the pedestrian light, but the officer nonetheless issued him a ticket.  Mr. Markosian initially pled not guilty, but he eventually paid the ticket to avoid the hassle of pursuing a challenge.

130.    On April 26, 2025, cyclist Jordan Lilly was ticketed for crossing the intersection at Ninth Ave and West 48th Street in Hell's Kitchen, Manhattan during an LPI.  Mr. Lilly's hearing was rescheduled to April 9, 2026.

131.    On May 20, 2025, cyclist Gijon Polite was ticketed for crossing two intersections, at Jay Street and Willoughby Street and Jay Street and Fulton Street in downtown Brooklyn, during LPIs.  Mr. Polite explained to the NYPD officer that he was legally permitted to cross with the pedestrian light.  The officer responded that he did not see the pedestrian light and issued two tickets.  Mr. Polite's hearing has been rescheduled to February 17, 2026.

132.    Numerous other cyclists have reported on online forums having been ticketed by NYPD officers for crossing during LPIs:

- A cyclist reported being ticketed in June 2023 for crossing an intersection in the Lower East Side in Manhattan during an LPI;[12]

- A cyclist reported being ticketed in October 2023 for crossing the intersection of 12th Street and First Avenue in Manhattan during an LPI;[13]

- A cyclist reported being ticketed in June 2024 for crossing the intersection of 44th Street and Fourth Avenue in Brooklyn during an LPI;[14]

---

[12] *See* https://www.reddit.com/r/NYCbike/comments/14n4yhq/red_light_ticket_190/.
[13] *See* https://www.reddit.com/r/NYCbike/comments/17fclfx/ticketed_for_going_on_lpi/.
[14] *See* https://www.reddit.com/r/NYCbike/comments/14n4yhq/red_light_ticket_190/.

- A cyclist reported being ticketed in October 2024 for crossing an intersection in Sunset Park, Brooklyn during an LPI;[15]

- A cyclist reported being given three separate tickets in February 2025 for crossing an intersection in Brooklyn during an LPI;[16] and

- A cyclist reported that in April 2025 they were issued a criminal court summons for crossing the intersection of 24th Street and Sixth Avenue in Manhattan during an LPI.[17]

133.    Upon information and belief, during the past three years, there have been hundreds or thousands more such incidents of cyclists being unlawfully ticketed or issued summonses for crossing intersections while the pedestrian light indicated white/walk.

134.    Upon information and belief, many of those tickets and summonses have been dismissed or otherwise adjudicated in favor of the cyclists.

135.    With respect to the June 2022 incident referenced above, at the DMV hearing held on April 11, 2023, NYPD Officer James Mariconi testified under oath to his understanding of the law that, "When you're on a bike, you must physically stop at all red lights and wait until the light turns green" and that cyclists must "obey all traffic signals."[18]

136.    Andrea Adleman subsequently brought an Article 78 petition in Supreme Court, New York County challenging the June 2022 ticket, in which both the Supreme Court Justice

---

[15] *See*
https://www.reddit.com/r/NYCbike/comments/1ge9fbl/careful_with_red_light_bike_ticketing_in_sunset/.
[16] *See*
https://www.reddit.com/r/NYCbike/comments/1in47ww/stopped_for_going_through_red_light_got_three/.
[17] *See*
https://www.reddit.com/r/NYCbike/comments/1ka4r4y/finally_got_a_red_light_ticket_advice/.
[18] *See Adleman v. New York State Department of Motor Vehicles et al.*, Index No. 161816/2023 (Supreme Court, New York County), Dkt. No. 3.

and the attorney representing the City of New York expressly acknowledged on the record that "the ticket was improperly given."[19]

137.    At a November 21, 2024 court hearing in that proceeding, Justice Nicholas Moyne and attorney James Cullen of the New York City Law Department had the following colloquy:

> THE COURT: Is it the case, do we all agree, that under City law if you are on a bike and you're at the intersection and there's a walk signal for the pedestrian and the vehicle signal is red, right, that's what we're talking about, do we all agree that under the law you can proceed into the intersection and go even though the vehicle signal is red? Do we agree that's the law?
>
> . . .
>
> MR. CULLEN: Yes.
>
> THE COURT: Is that, in fact, the law?
>
> MR. CULLEN: Yes, except where there's otherwise indicated traffic control devices which is not at issue in this case, but just clarifying the statute has a --
>
> THE COURT: Okay. Well, because the only -- right. In other words, for purposes of the bike, what you have -- I mean, I don't know if you want to call it contradictory signals, but if the signal is walk and the vehicle is red, the walk sign governs for the bike. Okay.
>
> . . .
>
> THE COURT: You agree that was the law and you agree that ticket was improperly given and it's been refunded, right?

---

[19] *See Adleman*, Index No. 161816/2023, Dkt. No. 26 at 3:21.

MR. CULLEN: Yes.[20]

138.    Despite this clear acknowledgment by a Justice of New York State Supreme Court and by an attorney representing the City on November 21, 2024 that Ms. Adleman had been "improperly given" a ticket for crossing an intersection on a bicycle when the traffic light was red but the pedestrian light was white, the City continued to ticket cyclists in that circumstance, including in the instances involving the named Plaintiffs and other individuals cited in this Complaint that occurred after that date.

139.    The NYPD has recently implemented a policy to crackdown on cyclists, which has and will continue to result in an increase in ticketing and criminal summonses to cyclists in New York City, and accordingly an increase in unlawful tickets and summonses being issued in contravention of N.Y.C. Admin. Code 19-195.1(b).

140.    On April 10, 2025, at a press conference alongside Mayor Eric Adams, Defendant Tisch publicly announced that the NYPD would be increasing enforcement of traffic violations by cyclists.[21]  At a City Council hearing on April 28, 2025, senior NYPD officials, including NYPD Chief of Transportation Olufunmilola Obe and Traffic Division Commanding Officer Inspector Brian O'Sullivan, further described the NYPD's new policy of increased traffic law enforcement against cyclists, stating that cyclists would be given criminal court summonses for minor traffic offenses, and that they would focus on six types of violations for increased enforcement, one of which is red light violations.[22]

---

[20] *See Adleman*, Index No. 161816/2023, Dkt. No. 26 at 2:15-3:21.
[21] *See* https://nyc.streetsblog.org/2025/05/02/policy-change-nypd-will-write-criminal-summonses-not-traffic-tickets-for-cyclists.
[22] https://citymeetings.nyc/meetings/new-york-city-council/2025-04-28-1000-am-committee-on-public-safety/chapter/discussion-on-e-bikes-and-traffic-violations-in-new-york-city/.

141.    In an Op-Ed published on May 14, 2025, Defendant Tisch further explained the crackdown on cyclists, asserting that NYPD officers were focused on increased enforcement against cyclists during morning and evening commuting hours, along 14 specific high traffic areas of the City, and that one of the specific violations the NYPD was focused on was "disobeying red light signals."[23]

142.    This crackdown on cyclists has been done as part of the "Quality of Life" initiative that Defendant Tisch and Mayor Adams announced in April 2025 as a pilot in six police precincts.[24]  Defendant Tisch and Mayor Adams have since announced a dramatic expansion of the "Quality of Life Teams" initiative to much broader swaths of the city.[25]

143.    The number of tickets given to cyclists increased dramatically in the first quarter of 2025 compared to any of the last four years.[26]

144.    Despite the NYPD's occasional claim that increasing the ticketing of cyclists furthers pedestrian safety, the data show otherwise.  A tiny percentage of pedestrian injuries are caused by bicycles of any sort.

145.    The unlawful treatment of the Plaintiffs and the Putative Class was caused by a failure by the City to train and supervise its employees that amounted to deliberate indifference to the rights of those who come into contact with City employees.

---

[23] https://nypost.com/2025/05/14/opinion/reckless-e-bikers-are-a-menace-how-nypd-is-cracking-down/.

[24] https://www.nyc.gov/mayors-office/news/2025/04/mayor-adams-nypd-commissioner-tisch-launch-new-quality-life-division-enhance-public-safety.

[25] https://www.nyc.gov/mayors-office/news/2025/08/mayor-adams-and-nypd-commissioner-tisch-expand-quality-of-life-t0;
https://www.nytimes.com/2025/08/11/nyregion/nypd-quality-of-life-teams.html.

[26] https://nyc.streetsblog.org/2025/05/06/as-nypds-criminal-crackdown-on-cyclists-expands-it-grows-more-absurd-victims.

146.    On information and belief, after Local Law 154 was passed in 2019, the City did not provide any specific training to NYPD personnel regarding that law, nor did it otherwise inform them of the substance of that new law.

147.    To the contrary, NYPD officers' general understanding based on trainings and other information they receive from the City, is that cyclists are required to obey all traffic laws. For example, as described above, Defendant Vega testified on April 15, 2025 that this was his understanding of the law, and Police Officer James Mariconi testified on April 11, 2023 that this was his understanding of the law.  As described above, numerous other police officers indicated during stops of cyclists that they shared this understanding of the law.  Local Law 154 makes clear that these officers' understanding of the law is legally incorrect.

148.    The City has failed properly to train officers that cyclists are permitted to cross intersections when the vehicle light is red but the pedestrian light is white.

149.    At all relevant times, Defendant Tisch has known or should have known that NYPD officers are not being trained properly on the law and/or do not know the law regarding cyclists crossing intersections during pedestrian signals.  Yet, on information and belief, Defendant Tisch has made no additional efforts to train NYPD officers or otherwise ensure that the law is properly enforced to avoid unlawful seizures and the issuance of unlawful summonses.

150.    At the same time, Defendant Tisch has since April 2025 urged NYPD officers to crack down on cyclists and issue more summonses for minor traffic violations.  These directives from the NYPD Commissioner, combined with NYPD officers' incorrect understanding of the law regarding LPIs, predictably result in NYPD officers unlawfully stopping and issuing summonses to cyclists who cross during LPIs.

151.    The putative Rule (b)(2) and Rule (b)(3) classes are sufficiently large that joinder of all the members would be impractical.

152.    Pursuant to the City's policy and practice, all of the Rule (b)(3) class members were subjected to violations of their constitutional rights which caused injury, including without limitation psychological injury and/or lost wages, time, and/or attorney's fees spent fighting the unlawful tickets/summonses.

153.    On information and belief, many of the putative class members are economically disadvantaged, making individual lawsuits impracticable.

154.    Judicial economy weighs in favor of avoiding multiple actions challenging the same policy and practice, particularly where individual suits could lead to potentially inconsistent results.

155.    The class members are identifiable using records maintained by the City in the ordinary course of business.

156.    According to NYPD data, over 13,000 cyclists were ticketed for traffic signal violations between 2018 and 2024.

157.    The City maintains data on the precise location of each ticket issued to a cyclist, including the geographic coordinates.

158.    There are at least 6,659 intersections in New York City with LPIs, and an additional at least 707 intersections in New York City with Exclusive Pedestrian Signals, according to data made publicly available by the City.

159.    The City maintains lists of all intersections with LPIs and Exclusive Pedestrian Signals, including their geographic coordinates.

160.    Common questions of law and fact exist for all class members herein and predominate over any questions solely affecting individual members thereof.

161.    Among the questions of law and fact common to members of the class are: (i) whether and which defendants failed to understand N.Y.C. Admin. Code 19-195.1(b), including by wrongfully arresting, detaining, charging, summonsing, ticketing and/or prosecuting class members for a violation of law when there was none; (ii) the existence of a pattern and practice of stopping, arresting, and ticketing and/or issuing criminal summonses to members of the class; (iii) the acquiescence of supervisory personnel in the NYPD in the known unlawful acts of subordinates; (iv) the failure of supervisory defendants to train, supervise, and discipline police officers; and (v) the appropriate injunctive remedies that will be needed to ensure the end of this unlawful pattern and practice, and to ensure that its harmful effects are remedied.

162.    The City is expected to raise common defenses to the claims of all class members herein, including denying that its policy and practice violated the Constitution.

163.    Common issues of law and fact such as those set forth above, and many others, predominate over any individual issues.

164.    Plaintiffs' claims are typical of those of all putative class members herein, as Plaintiffs' claims arise from the same municipal policy and practice, and Plaintiffs' claims are based on the same legal theories as those of all putative class members herein.

165.    The cause of Plaintiffs' injuries is the same as the cause of the injuries suffered by all putative class members herein, namely the City's policy and practice.

166.    Maintaining this action as a class action is superior to other available methods because individual damages claims are not likely to be feasible.

167.    All of the members of the Rule (b)(3) class were injured as a result of Defendants'
conduct, including without limitation the psychological injury of being subjected to unlawful
tickets and summonses as well as lost time, wages, and/or attorney's fees spent in fighting the
unlawful ticket/summons.  The damages suffered by members of the Class are small in relation
to the extraordinary expense and burden of individual litigation and therefore it is highly
impractical for such Class members to attempt redress for damages incurred due to their
wrongful arrest and prosecution.

168.    Plaintiffs are capable of fairly and adequately protecting the interests of all
putative class members herein because Plaintiffs do not have any antagonistic interests thereto.

169.    Counsel for Plaintiffs is experienced in civil rights litigation, complex litigation,
and class actions.

### FIRST CLAIM FOR RELIEF
42 U.S.C. § 1983 – Fourth and Fourteenth Amendments – False Arrest
(Against All Defendants)

170.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully
set forth at length herein.

171.    Defendant Vega wrongfully and intentionally arrested Plaintiff Casey Esparza
when he detained Plaintiff against his will for the purpose of subjecting Plaintiff Casey Esparza
to an unlawful ticket/summons.

172.    Defendant Vega wrongfully and intentionally arrested Plaintiff Nasrallah when he
detained Plaintiff Nasrallah against his will for the purpose of subjecting him to an unlawful
ticket/summons.

173.    Defendant Pessoa wrongfully and intentionally arrested Plaintiff Bloxham when he detained Plaintiff Bloxham against his will for the purpose of subjecting him to an unlawful ticket/summons.

174.    Defendant Keller wrongfully and intentionally arrested Plaintiff Gupta when he detained Plaintiff Gupta against his will for the purpose of subjecting him to an unlawful ticket/summons.

175.    Defendant Martino wrongfully and intentionally arrested Plaintiff Harper when he detained Plaintiff Harper against his will for the purpose of subjecting him to an unlawful ticket/summons

176.    Defendant John Doe 1 wrongfully and intentionally arrested Plaintiff Lee when he detained Plaintiff Lee against his will for the purpose of subjecting him to an unlawful ticket/summons.

177.    Defendant Lall wrongfully and intentionally arrested Plaintiff Pender when she detained Plaintiff Pender against her will for the purpose of subjecting her to an unlawful ticket/summons.

178.    Plaintiffs were conscious of the unlawful confinement.

179.    Plaintiffs did not consent to the confinement.

180.    The confinement of Plaintiffs was not privileged because Defendants Vega, Pessoa, Keller, Martino, John Doe 1, and Lall lacked reasonable suspicion and/or probable cause to stop and detain Plaintiffs.

181.    The actions of Defendants Vega, Pessoa, Keller, Martino, John Doe 1, and Lall deprived Plaintiffs of the rights, remedies, privileges, and immunities guaranteed to every citizen

of the United States, in violation of 42 U.S.C. §1983, including without limitation rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution.

182.    Defendants Jane and John Does 2 through 100 have and/or will deprive the putative Rule (b)(2) and Rule (b)(3) class members of the rights, remedies, privileges, and immunities guaranteed to every citizen of the United States, in violation of 42 U.S.C. § 1983, including without limitation rights guaranteed by the Fourth and Fourteenth Amendments to the United States Constitution, by, *inter alia*: stopping and falsely arresting the putative class members by detaining them for the purpose of issuing baseless and unlawful tickets/summonses.

183.    The City, through the NYPD, maintains a policy and practice of detaining and/or arresting cyclists who lawfully ride through intersections during red light traffic signals while the pedestrian light indicates white/walk.

184.    This policy and practice is so consistent and widespread that it constitutes a custom or usage of which policymakers, including Defendant Commissioner Tisch, must have been aware.

185.    This policy and practice results directly from the failure by policymakers, including Defendant Commissioner Tisch, to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

186.    As a direct and proximate result of the City's policy and practice, Plaintiffs and the putative Rule (b)(3) class members suffered damages in an amount to be proven at trial.

187.    As a direct and proximate result of the City's ongoing policy and practice, Plaintiffs and the putative Rule (b)(2) class members have and will suffer unlawful stops, arrests

and prosecution, pursued and imposed upon them without any legal basis, which must be enjoined.

188.    Because Defendants' unlawful conduct was and is knowing, purposeful, malicious, and outrageous, Plaintiffs and the putative Rule (b)(3) class members are entitled to an award of punitive damages.

### SECOND CLAIM FOR RELIEF
New York State Constitution, Article I, § 12
(Against All Defendants)

189.    Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth herein.

190.    Defendant Vega wrongfully and illegally stopped, detained, and arrested Plaintiffs Casey Esparza and Nasrallah without legal basis or justification in violation of their rights under Article I, § 12 of the New York Constitution.

191.    Defendant Pessoa wrongfully and illegally stopped, detained, and arrested Plaintiff Bloxham without legal basis or justification in violation of his rights under Article I, § 12 of the New York Constitution.

192.    Defendant Keller wrongfully and illegally stopped, detained, and arrested Plaintiff Gupta without legal basis or justification in violation of his rights under Article I, § 12 of the New York Constitution.

193.    Defendant Martino wrongfully and illegally stopped, detained, and arrested Plaintiff Harper without legal basis or justification in violation of his rights under Article I, § 12 of the New York Constitution.

194.    Defendant John Doe 1 wrongfully and illegally stopped, detained, and arrested Plaintiff Lee without legal basis or justification in violation of his rights under Article I, § 12 of

the New York Constitution.

195.    Defendant Lall wrongfully and illegally stopped, detained, and arrested Plaintiff Pender without legal basis or justification in violation of her rights under Article I, § 12 of the New York Constitution.

196.    Defendants Jane and John Does 2 through 100 have and/or will wrongfully and illegally stop, detain, and/or arrest the putative Rule (b)(2) and Rule (b)(3) class members by stopping them, demanding identification, and subjecting them to ticketing/summonses and further constraints without legal basis in violation of their rights under Article I, § 12 of the New York Constitution.

197.    The wrongful, unjustifiable and unlawful apprehension, stop, arrest, and/or detention of Plaintiffs and members of the putative Rule (b)(2) and Rule (b)(3) classes were, are and will be carried out without probable cause or reasonable suspicion, in violation of the New York Constitution.

198.    The City, through the NYPD, maintains a policy and practice of detaining and/or arresting cyclists who lawfully ride through intersections during red light traffic signals while the pedestrian light indicates white/walk.

199.    This policy and practice is so consistent and widespread that it constitutes a custom or usage of which policymakers, including Defendant Commissioner Tisch, must have been aware.

200.    This policy and practice results directly from the failure by policymakers, including Defendant Commissioner Tisch, to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

201.    Defendant City, as the employer of Defendants Vega, Pessoa, Keller, Martino, and Lall, and Defendants Jane and John Does 1 through 100, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

202.    As a direct and proximate result of the City's policy and practice, Plaintiffs and the putative Rule (b)(3) class members suffered damages in an amount to be proven at trial.

203.    As a direct and proximate result of the City's ongoing policy and practice, Plaintiffs and the putative Rule (b)(2) class members have and will suffer unlawful stops, arrests, and prosecution, pursued and imposed upon them without any legal basis, which must be enjoined.

204.    Because Defendants' unlawful conduct was and is knowing, purposeful, malicious, and outrageous, Plaintiffs and the putative Rule (b)(3) class members are entitled to an award of punitive damages.

<u>**THIRD CLAIM FOR RELIEF**</u>
New York Common Law – False Arrest
(Against All Defendants)

205.    Plaintiffs repeat and reallege the above paragraphs as if the same were fully set forth herein.

206.    Defendant Vega wrongfully and intentionally arrested Plaintiffs Casey Esparza and Nasrallah when he detained Plaintiffs against their will for the purpose of subjecting Plaintiffs Casey Esparza and Nasrallah to unlawful tickets/summonses.

207.    Defendant Pessoa wrongfully and intentionally arrested Plaintiff Bloxham when he detained Plaintiff Bloxham against his will for the purpose of subjecting him to an unlawful ticket/summons.

208.    Defendant Keller wrongfully and intentionally arrested Plaintiff Gupta when he detained Plaintiff Gupta against his will for the purpose of subjecting him to an unlawful ticket/summons.

209.    Defendant Martino wrongfully and intentionally arrested Plaintiff Harper when he detained Plaintiff Harper against his will for the purpose of subjecting him to an unlawful ticket/summons.

210.    Defendant John Doe 1 wrongfully and intentionally arrested Plaintiff Lee when he detained Plaintiff Lee against his will for the purpose of subjecting him to an unlawful ticket/summons.

211.    Defendant Lall wrongfully and intentionally arrested Plaintiff Pender when she detained Plaintiff Pender against her will for the purpose of subjecting her to an unlawful ticket/summons.

212.    Plaintiffs were conscious of the unlawful confinement.

213.    Plaintiffs did not consent to the confinement.

214.    The confinement of Plaintiffs was not privileged because Defendants Vega, Pessoa, Keller, Martino, John Doe 1, and Lall lacked reasonable suspicion and/or probable cause to stop and detain Plaintiffs.

215.    Defendants Jane and John Does 2 through 100 have and/or will violate the common law rights of the putative Rule (b)(2) and Rule (b)(3) class members by, *inter alia*: stopping and falsely arresting the putative class members by detaining them for the purpose of issuing baseless and unlawful tickets/summonses, including by keeping putative class members confined and restricted against freely moving, without their consent.

216.    Defendant City, as the employer of Defendants Vega, Pessoa, Keller, Martino, Lall and Defendants Jane and John Does 1 through 100, is responsible for their wrongdoing under the doctrine of *respondeat superior*.

217.    As a direct and proximate result of the City's policy and practice, Plaintiffs and the putative Rule (b)(3) class members suffered damages in an amount to be proven at trial.

218.    As a direct and proximate result of the City's ongoing policy and practice, Plaintiffs and the putative Rule (b)(2) class members have and will suffer unlawful stops, arrests and prosecution, pursued and imposed upon them without any legal basis, which must be enjoined.

219.    Because Defendants' unlawful conduct was and is knowing, purposeful, malicious, and outrageous, Plaintiffs and the putative Rule (b)(3) class members are entitled to an award of punitive damages.

<u>**FOURTH CLAIM FOR RELIEF**</u>
New York City Administrative Code § 8-801 et seq.
(Against All Defendants)

220.    Plaintiffs repeat and reallege the foregoing paragraphs as if the same were fully set forth at length herein.

221.    New York City Administrative Code § 8-802 protects each person's right to be free from unreasonable searches and seizures.

222.    New York City Administrative Code § 8-803 affords a private right of action for any deprivation of the rights protected by Section 8-802.

223.    Defendant Vega unreasonably seized Plaintiffs Casey Esparza and Nasrallah by detaining Plaintiffs against their will without reasonable suspicion or probable cause to believe

that they had committed any crime, were about to commit any crime, or posed any threat of physical harm to Defendant Vega or anyone else.

224.    Defendant Pessoa unreasonably seized Plaintiff Bloxham by detaining Plaintiff Bloxham against his will without reasonable suspicion or probable cause to believe that he had committed any crime, was about to commit any crime, or posed any threat of physical harm to Defendant Pessoa or anyone else.

225.    Defendant Keller unreasonably seized Plaintiff Gupta by detaining Plaintiff Gupta against his will without reasonable suspicion or probable cause to believe that he had committed any crime, was about to commit any crime, or posed any threat of physical harm to Defendant Keller or anyone else.

226.    Defendant Martino unreasonably seized Plaintiff Harper by detaining Plaintiff Harper against his will without reasonable suspicion or probable cause to believe that he had committed any crime, was about to commit any crime, or posed any threat of physical harm to Defendant Martino or anyone else.

227.    Defendant John Doe 1 unreasonably seized Plaintiff Lee by detaining Plaintiff Lee against his will without reasonable suspicion or probable cause to believe that he had committed any crime, was about to commit any crime, or posed any threat of physical harm to Defendant John Doe 1 or anyone else.

228.    Defendant Lall unreasonably seized Plaintiff Pender by detaining Plaintiff Pender against her will without reasonable suspicion or probable cause to believe that she had committed any crime, was about to commit any crime, or posed any threat of physical harm to Defendant Lall or anyone else.

229.     Defendants Jane and John Does 2 through 100 have and/or will unreasonably seize the putative Rule (b)(2) and Rule (b)(3) class members by detaining them against their will without reasonable suspicion or probable cause to believe they had committed any crime, were about to commit any crime, or posed any threat of physical harm to anyone.

230.     At all times, Defendants Vega, Pessoa, Keller, Martino, Lall and Jane and John Does 1 through 100 were employees of the City of New York and the NYPD acting within the scope of their employment.  Defendant City is therefore liable to Plaintiffs pursuant to New York City Administrative Code § 8-803(b).

231.     The City, through the NYPD, maintains a policy and practice of ticketing and prosecuting cyclists who lawfully ride through intersections during red light traffic signals while the pedestrian light indicates white/walk.

232.     This policy and practice is so consistent and widespread that it constitutes a custom or usage of which policymakers, including Defendant Commissioner Tisch, must have been aware.

233.     This policy and practice results directly from the failure by policymakers, including Defendant Commissioner Tisch, to provide adequate training or supervision to subordinates to such an extent that it amounts to deliberate indifference to the rights of those who come into contact with the municipal employees.

234.     As a direct and proximate result of the City's policy and practice, Plaintiffs and the putative Rule (b)(3) class members suffered damages in an amount to be proven at trial.

235.     As a direct and proximate result of the City's ongoing policy and practice, Plaintiffs and the putative Rule (b)(2) class members have and will suffer unlawful ticketing and prosecution, pursued and imposed upon them without any legal basis, which must be enjoined.

236.    Because Defendants' unlawful conduct was knowing, purposeful, malicious, and outrageous, Plaintiffs and the putative Rule (b)(3) class members are entitled to an award of punitive damages.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs request that the Court grant the following relief:

a.    Declare that the suit is maintainable as a class action pursuant to Federal Rules of Civil Procedure 23(a), (b)(1), (b)(2) and (b)(3);

b.    Declare that Defendants have committed the violations of law alleged in this action;

c.    Issue an order preliminarily and permanently enjoining and directing Defendants to cease detaining, arresting, ticketing, issuing summons to, charging, or prosecuting individuals for cycling through intersections while the pedestrian light indicates white/walk; and to take appropriate ameliorative measures to ensure that no one is detained, arrested, ticketed, issued a summons, charged, or prosecuted for cycling through an intersection while the pedestrian light indicates white/walk, including without limitation:

1. Directing Defendants to immediately communicate to all members of the NYPD that cyclists are lawfully permitted to cross an intersection during red light traffic signals while the pedestrian light indicates white/walk;

2. Directing Defendants to develop and implement appropriate immediate training to be provided to all current and future members of the NYPD making clear that cyclists may not be detained, arrested, ticketed, issued summonses, charged, or prosecuted for crossing an intersection during red light traffic signals while the pedestrian light indicates white/walk;

3. Directing Defendants to issue policies and procedures to ensure that cyclists are not detained, arrested, ticketed, issued summonses, charged, or prosecuted for crossing intersections during red light traffic signals while the pedestrian light indicates white/walk; and

4. Establishing a system for tracking arrests, tickets, and summonses issued to cyclists for red light violations which indicates whether the pedestrian signal was white or red at the time of the alleged violation.

d. Award compensatory damages in an amount to be determined for all physical, psychological, mental, emotional, and economic injuries, as well as loss of liberty, sustained by Plaintiffs and the Rule 23(b)(3) class as a result of the policies and practices alleged herein;

e. Award punitive damages;

f. Award reasonable attorneys' fees, together with the costs of this action; and

g. Grant such other further relief as the Court may deem appropriate.

Dated:  November 14, 2025
    New York, New York

Respectfully submitted,

WANG HECKER LLP

By: _____

    Mariann Meier Wang
    Eric Hecker
    Alexander Goldenberg
    Daniel Mullkoff
    Lily Sawyer-Kaplan
    111 Broadway, Suite 1406
    New York, New York 10006
    (212) 620-2600

    *Attorneys for Plaintiffs and the Putative Class*